## STATE OF CONNECTICUT *v.* DENNIS CROSSWELL
## (14286)

PETERS, C. J., CALLAHAN, GLASS, BORDEN and BERDON, Js.

Argued April 28—decision released August 4, 1992

*Charles D. Ray,* special public defender, for the appellant (defendant).

*Harry Weller,* assistant state's attorney, with whom were *John M. Bailey,* state's attorney, and, on the brief, *Rosita M. Creamer,* senior assistant state's attorney, for the appellee (state).

PETERS, C. J. The principal issues in this criminal appeal arise out of the contention of the defendant,

Dennis Crosswell, that he is entitled to an acquittal on the ground of evidentiary insufficiency on each count of the multi-count substitute information lodged against him by the state. After a jury trial, the defendant was found guilty of the crimes of robbery in the first degree in violation of General Statutes § 53a-134 (a) (4), conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 and 53a-134 (a) (4), burglary in the first degree in violation of General Statutes §§ 53a-101 (a) (2) and 53a-8, conspiracy to commit burglary in the first degree in violation of General Statutes §§ 53a-48 and 53a-101 (a) (2), and assault in the second degree in violation of General Statutes §§ 53a-60 (a) (2) and 53a-8.[1] The trial court sentenced

---

[1] General Statutes § 53a-134 (a) (4) provides: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime . . . displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm; except that in any prosecution under this subdivision, it is an affirmative defense that such pistol, revolver, rifle, shotgun, machine gun or other firearm was not a weapon from which a shot could be discharged. Nothing contained in this subdivision shall constitute a defense to a prosecution for, or preclude a conviction of, robbery in the second degree, robbery in the third degree or any other crime."

"[General Statutes] Sec. 53a-48. CONSPIRACY. RENUNCIATION. (a) A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy.

"(b) It shall be a defense to a charge of conspiracy that the actor, after conspiring to commit a crime, thwarted the success of the conspiracy, under circumstances manifesting a complete and voluntary renunciation of his criminal purpose."

General Statutes § 53a-101 (a) (2) provides: "A person is guilty of burglary in the first degree when he enters or remains unlawfully in a building with intent to commit a crime therein and . . . in the course of committing the offense, he intentionally, knowingly or recklessly inflicts or attempts to inflict bodily injury on anyone."

"[General Statutes] Sec. 53a-8. CRIMINAL LIABILITY FOR ACTS OF ANOTHER. A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intention-

him to concurrent sentences on the first four counts and a consecutive sentence on the fifth count for an effective term of sixteen years imprisonment. The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). We reverse the judgment in part.

The defendant and Everald Howard were charged as codefendants with the same crimes and were tried jointly. In *State* v. *Howard,* 221 Conn. 447, 450–51, 604 A.2d 1294 (1992), affirming Howard's conviction, we noted the facts that the jury could reasonably have found.

"On January 11, 1989, [the defendant], Charlyene Holmes, another person identified only as Jasper and [Everald Howard] agreed to steal $15,000 that Jasper and [Howard] believed was hidden in an apartment in a three-family house in Hartford.[2] They decided that Holmes would knock on the door to the apartment, in the hope that, because she was a woman, someone unsuspecting would open it and that they would then all enter the house and steal the money.

"That evening, [the defendant], Holmes, Jasper and [Howard] drove to the house as agreed. Holmes checked the rear door of the first floor apartment and, finding it locked, returned to the car, where [Howard] handed

---

ally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

General Statutes § 53a-60 (a) (2) provides: "A person is guilty of assault in the second degree when . . . with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument."

[2] "Jasper, a drug dealer, was involved in a dispute over drug money with someone living in the house and devised this plan to obtain the money." *State* v. *Howard,* 221 Conn. 447, 450 n.6, 604 A.2d 1294 (1992).

her a loaded revolver. Approximately one-half hour later, Holmes, accompanied by [the defendant], who was wearing a mask, and [Howard], who was not, knocked on the door of the first floor apartment. Suzette Hutchinson came to the door and asked who was there. She opened the door after Holmes had falsely identified herself as 'Tuesday,'[3] Hutchinson's sister. [The defendant], Holmes and [Howard] then pushed the door wide open and entered the kitchen of the apartment where Hutchinson had been watching television with Chesley Smith, her cousin, and Hilda Edwards, their grandmother. Holmes gave the revolver to [Howard], who pointed it at Hutchinson, Smith and Edwards and ordered them into the bedroom. Hutchinson and Smith complied, but Edwards remained in the kitchen because of her limited ability to walk. Already in the bedroom were several other relatives of Hutchinson: Roxanne Facey, her sister, Timothy Hester, her ten year old brother and Travalis Johnson, her four year old nephew. [Howard] pointed the revolver at the group in the bedroom and demanded money. Smith, Hutchinson and Facey gave [Howard] a total of $43.75. Meanwhile, Holmes searched the bedroom, overturning the bed, pulling off the mattress and tearing out dresser drawers, but failed to discover any money. [Howard] then threatened to shoot Smith if more money was not handed over. When Smith denied knowing about any other money in the apartment, [Howard] hit him on the head with the revolver. Smith knelt down and began crying. [Howard] then took him to another bedroom where he again hit him on the head with the revolver and punched him in the stomach and shoulders.

"While these events were unfolding, Edwards, the grandmother, was screaming from the kitchen. [Either Howard or the defendant] hit Edwards on the head to

---

[3] "Tuesday's" real name was Claudia Ann Marie Johnson.

silence her, causing her to cry out louder.[4] When Smith attempted to come to her aid, [Howard] prevented him from doing so. The search for money continued throughout the apartment until Holmes noticed a small basement room in which she discovered a pouch containing $15,000. Holmes, [the defendant] and [Howard] then ran from the house and later divided the money, [Howard] receiving $5000, Holmes receiving $4000, [the defendant] receiving $2000 and Jasper receiving $4000.''

The defendant has proffered numerous claims in support of his contention that his conviction must be overturned.[5] First, he contends that the trial court should have granted his motion for acquittal, because of insufficiency of the evidence, on each of the charges of which he was convicted.[6] Second, he maintains that the information charging him with burglary in the first degree was so defective that it either deprived the trial court of jurisdiction or misled the jury into convicting the defendant without a finding that the state had proven one essential element of the crime. Third, he argues that principles of double jeopardy forbid his con-

---

[4] The trial court acquitted the defendant, as well as Howard, of the count of the information charging assault of a victim sixty years or older in the second degree in violation of General Statutes § 53a-60b. The evidence at trial established Edwards' age as over sixty. There was conflicting testimony about whether it was Howard or the defendant who struck Edwards. The trial court did not articulate why it granted the motion for acquittal on this count except to note its conclusion that "each essential element of that crime could not logically be found beyond a reasonable doubt by any rational trier of facts.''

[5] We take this occasion to restate our concern that the sheer number of these claims obscures the validity of any that may be meritorious. See *State* v. *Pelletier*, 209 Conn. 564, 566–67, 552 A.2d 805 (1989).

[6] The trial court granted the defendant's motion for acquittal not only on the charge of assault of a victim sixty years or older; see footnote 4, supra; but also on the charge of larceny in the second degree in violation of General Statutes § 53a-123 (a) (3), and of conspiracy to commit larceny in the second degree in violation of General Statutes §§ 53a-48 and 53a-123 (a) (3).

viction of two conspiracies arising out of the same alleged agreement between the three conspirators. Fourth, he claims that he is entitled to a new trial because the trial court should have granted his motion to suppress, which challenged the reliability of his identification by Smith and Hutchinson. Fifth, he asserts that he is entitled to a new trial because the trial court abused its discretion in denying trial counsel access to Holmes' psychiatric records. We agree in part with the defendant's claims about the sufficiency of the evidence, but otherwise affirm the judgment of the trial court.

I

The defendant does not challenge the standard governing this court's review of claims relating to the sufficiency of the evidence to sustain a criminal conviction. "Whether we review the findings of a trial court or the verdict of a jury, our underlying task is the same. . . . We first review the evidence presented at trial, construing it in the light most favorable to sustaining the facts expressly found by the trial court or impliedly found by the jury. We then decide whether, upon the facts thus established and the inferences reasonably drawn therefrom, the trial court or the jury could reasonably have concluded that the cumulative effect of the evidence established the defendant's guilt beyond a reasonable doubt." *State* v. *Jarrett,* 218 Conn. 766, 770–71, 591 A.2d 1225 (1991); *State* v. *Roseboro,* 221 Conn. 430, 434, 604 A.2d 1286 (1992). Applying that standard in this case, we conclude that the evidence presented by the state could reasonably have persuaded the jury, beyond a reasonable doubt, that the defendant committed the first three crimes with which he was charged, robbery in the first degree, conspiracy to commit robbery in the first degree and burglary in the first degree. There was, however, insufficient evi-

dence to support the verdict on the fourth count, conspiracy to commit burglary in the first degree, or on the fifth count, assault in the second degree.

A

With respect to the charge of robbery in the first degree, the information charged the defendant with having "used and/or threatened the immediate use of physical force upon another" during the course of a larceny. The trial court's instructions to the jury on this charge referred to the language of the statute without including any reference to the defendant's possible accessorial liability. In light of these instructions, the defendant maintains that he is entitled to an acquittal because there was no evidence that he personally threatened anyone or that his actions were taken in the course of committing a larceny. We disagree with both of these assertions.

Under the governing statutes, "[a] person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny." General Statutes § 53a-133. A person has committed robbery in the first degree if, "in the course of the commission of the crime . . . he or another participant in the crime . . . uses or threatens the use of a dangerous instrument." General Statutes § 53a-134 (a) (3).

"The use or threatened use of immediate physical force is the element which distinguishes larceny from robbery." *State* v. *Childree*, 189 Conn. 114, 123, 454 A.2d 1274 (1983). "[I]f the use of force occurs during

the continuous sequence of events surrounding the taking . . . even though some time immediately before or after, it is considered to be 'in the course of' the robbery . . . within the meaning of the statute." *State v. Ghere,* 201 Conn. 289, 297, 513 A.2d 1226 (1986).

The jury could reasonably have found, beyond a reasonable doubt, that the defendant forced his way onto the premises, in the company of two other persons, one or another of whom was at all times brandishing a gun. By their words and conduct, acting in concert, all three made it clear that they would brook no interference in their search for the property they expected to find. The defendant personally, by his presence and his manner, intimidated Edwards, with whom he remained while the others were herded into another room. Hutchinson and Hester testified that they had heard Edwards cry out, and Smith testified that the defendant was in the kitchen with Edwards at that time and that afterwards Edwards had visible bruises on the side of her head. "[T]he threat of immediate bodily injury or death need not be directed at the owner himself; it may be made to a member of his family, or other relative, or even to someone in his company, though there be no threat to do harm to the owner himself." 2 W. LaFave & A. Scott, Substantive Criminal Law (1986) § 8.11, p. 448. If the jury found this evidence credible, it sufficed to establish that the defendant had himself participated in conduct that can fairly be considered intimidating.

The defendant next claims that there was no evidence that he participated in a larceny, because the state failed to establish: (1) the rightful ownership of the $15,000; (2) the defendant's personal role in the taking of the $43.75; or (3) the defendant's personal taking of any other personal property, such as jewelry from

the top of a dresser in the apartment.[7] Because we conclude that the state adduced sufficient evidence to allow the jury to find the defendant guilty of larceny with respect to the $15,000 taken from the apartment, we need not consider what other property the jury might have found to have been wrongfully appropriated.

The defendant maintains that the state cannot establish his participation in the commission of a larceny without proving who owned the $15,000 that Holmes, Howard and the defendant took from the premises. The defendant does not dispute, at this juncture, the sufficiency of the evidence to establish his participation in the taking of this money. He relies, however, on General Statutes § 53a-119,[8] which defines the crime of larceny as the wrongful taking, obtaining or withholding of property "from an owner." General Statutes § 53a-118 (5) defines the term "owner" as "any person who has a right to possession superior to that of a taker, obtainer or withholder." The defendant contends that the state had to show not only that someone else had physical possession of the money but that that person had a "right to possession superior" to that of the defendant, and that the state failed to meet this statutory burden.

In order to assess who had a "right to possession superior" to that of the defendant, it is important to identify what the record shows about the defendant's interest in the $15,000. Holmes testified that she thought the money was drug money and that it was being held by a friend of Jasper's, with whom Jasper

---

[7] Holmes testified that, while she was searching the basement room for the missing money pouch, she saw the defendant taking jewelry from the top of a dresser. Holmes' observation was corroborated by Hutchinson's testimony about a missing ring and necklace.

[8] General Statutes § 53a-119 provides in relevant part: "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner."

had had a misunderstanding. The defendant never claimed any ownership rights to the money except insofar as he was acting as agent for Jasper. The defendant's suggestion that he was acting on behalf of the rightful owner of the money is undermined by the evidence that the defendant gained entry by having Holmes misidentify herself as someone else, by the defendant's wearing a mask throughout the incident, and by the defendant's retention of a part of the money.

Holmes' testimony established that the $15,000 was taken from the apartment. The occupants of the apartment, with the exception of "Tuesday," disclaimed knowledge of, or of interest in, the money. The jury could, however, have inferred that "Tuesday" had possessory rights to the money at least superior to that of the defendant. Police Officer Katherine Perez testified about "Tuesday's" conduct when she returned to the apartment after the robbery. "Tuesday" did not inquire into the injuries sustained by any of her family members, but complained loudly about their improvidence in opening the door to strangers. Intent upon discovering whether she had lost anything, she immediately ran to her room and began looking for something there. The jury might, furthermore, have attached some significance to Holmes' use of "Tuesday's" name to gain entry into the apartment.

This court has not defined with specificity what the state must prove with regard to the victim's interest in the property, when that interest is arguably something less than full possessory ownership. Emphasizing actual possession, we have held that the statutory definition encompasses property held by someone who, although not its owner, was in lawful possession thereof. *State* v. *Taylor,* 196 Conn. 225, 229, 492 A.2d 155 (1985). Emphasizing constructive possession, we have held that lost property may be the subject of a

larceny. *State* v. *Courtsol,* 89 Conn. 564, 567–68, 94 A. 973 (1915); *Ransom* v. *State,* 22 Conn. 153, 160 (1852).

The state's evidence established, at a minimum, that someone other than the defendant and his confederates had custody or control of the money that they appropriated. In accordance with the view of courts in other jurisdictions that have considered this question, we hold that a showing that the victim had custody or control over the appropriated property is sufficient to support a charge of larceny. See *People* v. *Gould,* 384 Mich. 71, 79–80, 179 N.W.2d 617 (1970); *State* v. *Carlos,* 187 N.J. Super. 406, 412, 455 A.2d 89 (1982); *People* v. *Hutchinson,* 56 N.Y.2d 868, 869, 438 N.E.2d 1109, 453 N.Y.S.2d 394 (1982); *State* v. *Land,* 681 S.W.2d 589, 591 (Tenn. Crim. App. 1984).[9] This position is sustained by Professors LaFave and Scott, who note: "Many modern codes expressly provide, as does the Model Penal Code, that property may be the subject of theft even though the 'victim' is a person whose interest in the property is unlawful. This is as it should be. 'It is inconsistent with the objectives of the criminal law of theft to permit one who wrongfully appropriates wealth to escape from liability merely because the victim of the misappropriation has also incurred

[9] The cases cited by the defendant do not compel a different holding. In *Seiler* v. *State,* 522 So. 2d 113, 114 (Fla. App. 1988), the illegality of the defendant's retention of the fees that he had collected was successfully challenged because there was no showing that he was not legally entitled to collect the fees. In *People* v. *Taylor,* 207 Ill. App. 3d 206, 207–208, 565 N.E.2d 749 (1991), the defendant's conviction for stealing scrap aluminum was overturned because there was no showing of the alleged owner's having missed any of its property. In *Thomas* v. *State,* 515 N.E.2d 880, 881–82 (Ind. App. 1987), there was no showing that the defendant's use of the property was unauthorized. In *State* v. *Regnier,* 387 N.W.2d 223, 224 (Minn. App. 1986), there was no showing of the origins of the beer cans that the defendant had allegedly misappropriated. "It is well settled law that abandoned property cannot be the subject of larceny." *Commonwealth* v. *Wetmore,* 301 Pa. Super. 370, 373, 447 A.2d 1012 (1982).

criminal liability of forfeiture of his rights with respect to the property.' " 2 W. LaFave & A. Scott, supra, § 8.4, p. 356, quoting Model Penal Code (1980) § 223.2, comment 4, p. 171.

We agree with the state that the evidence adduced with respect to the $15,000 taken from the apartment was sufficient to sustain the jury's verdict on larceny as a component of the charge of robbery. The defendant was therefore not entitled to an acquittal on the charge of robbery in the first degree.

B

With respect to the charge of conspiracy to commit robbery in the first degree, the information charged that the defendant, with the intent to commit a robbery in the first degree, had agreed with Howard and Holmes "to use and/or threaten the immediate use of physical force upon another in the course of committing a larceny, that another participant in the crime displayed what was represented to be a firearm, and that an overt act was committed in pursuance of such conspiracy." As the defendant defines the scope of the conspiratorial agreement, only the events that were planned before the entry into the apartment have relevance. The defendant, therefore, renews his claim that the state has not proven the commission of a larceny in the taking of the $15,000, the only personal property whose taking could have been the object of a prior agreement. He also denies the existence of a prior agreement either that physical force be used or threatened or that another participant use a firearm.

We have already concluded that the defendant cannot prevail on his argument that the taking of the $15,000 did not constitute a larceny. The defendant maintains, however, that proof of the larceny does not establish the remaining elements of the conspiracy with which he was charged. He denies the existence of a prior

agreement either that physical force be used or threatened or that another participant use a firearm. The crucial issue to be resolved is, accordingly, the scope of a conspiratorial agreement. If two or more persons conspire to take particular property from someone who has a superior right of possession, and agree to do so peacefully, do subsequent changes in the modus operandi to accomplish the taking operate to discharge a willing participant from culpability?

The applicable principle of the law of criminal conspiracy was delineated in *State* v. *Ghere,* supra, 299, in which, relying on *State* v. *Holmes,* 160 Conn. 140, 150, 274 A.2d 153 (1970), we held that the requisite agreement or confederation may be inferred from proof of the separate acts of the individuals accused as coconspirators and from the circumstances surrounding the commission of these acts. See also *State* v. *Lewis,* 220 Conn. 602, 607, 600 A.2d 1330 (1991). The fact that the defendant stood by silently when a gun was displayed in order to gain entry and then to intimidate the occupants of the premises is evidence from which the jury might reasonably have inferred the defendant's acquiescence in this enlarged criminal enterprise. The fact that the defendant had available a mask to conceal his identity might reasonably have supported the jury's finding that he understood that he was engaged in an illegal endeavor and was prepared to see it through. Wherever the initial illegal conspiracy led the defendant and his confederates, "[i]t was enough if they knowingly engaged in a mutual plan to do a forbidden act." *State* v. *Holmes,* supra, 149.

## C

With respect to the charge of being an accessory to burglary in the first degree, the defendant contends that the state failed to prove that he intended to commit a crime in the apartment, or that he acted reck-

lessly. Under the accessorial liability statute, General Statutes § 53a-8, the state was required to prove that the defendant was "acting with the mental state required for commission of [that] offense." Under the first degree burglary statute, General Statutes § 53a-101 (a), the state was required to prove that the defendant "enter[ed] or remain[ed] unlawfully in a building with intent to commit a crime therein and . . . (2) in the course of committing the offense . . . intentionally, knowingly or recklessly inflict[ed] or attempt[ed] to inflict bodily injury on anyone."

The defendant's argument that the state failed to prove that he entered the apartment with the "intent to commit a crime" therein is fatally undermined, as his brief acknowledges, by our conclusion that the state adduced sufficient evidence to sustain the defendant's conviction for robbery. The defendant's masked entry, in the company of a confederate brandishing a gun, supports the jury's finding that he intended unlawfully and forcibly to enter the apartment in order to appropriate $15,000 to which someone else had a superior possessory interest. This evidence sufficed to prove his "intent to commit a crime" on the premises.

The defendant maintains that his conviction for accessory to burglary in the first degree also required proof of at least recklessness on his part with respect to Howard's infliction of bodily injury on the occupants of the apartment. It is disingenuous for the defendant to argue that he expected the $15,000 to be taken without violence once he became aware of the gun that was being wielded first by Holmes and then by Howard. He claims, however, that, even if he was aware that his accomplices had a gun, "there is simply no evidence on this record tending to show that he was aware of any risk, much less a substantial one, that it would be used to hit Chesley Smith."[10]

[10] The substitute information specifically identified the relevant victim as Chesley Smith.

The gist of the defendant's argument is that the charge of being an accessory to burglary in the first degree requires proof of the same mental state as is required to prove a charge of burglary in the first degree. The state responds by citing *State* v. *McCalpine*, 190 Conn. 822, 832, 463 A.2d 545 (1983), in which we interpreted our accessory statute to allow an accomplice to be found guilty even though he did not "know of or endorse every act of his co-participant[s] in crime." We stated, further, that the accessory was not required to "possess the intent to commit the specific degree" of the crime charged. Id., 832–33. The issue before the court in *McCalpine* was not, however, the sufficiency of the evidence to sustain a conviction but the persuasiveness of a belated and unpreserved attack on the adequacy of the trial court's instructions to the jury. Moreover, our statement about the intent of an accessory was dictum, in light of the elements of the crime at issue in *McCalpine*. Id., 831 n.7.[11]

To support its dictum, the *McCalpine* court cited *State* v. *Parham*, 174 Conn. 500, 506–509, 391 A.2d 148 (1978). It is not clear, however, that *Parham* stands for that proposition. It is true that, in *Parham*, the trial court charged the jury "that when more than one person participates in a burglary in the course of which one participant commits an act which raises the offense

---

[11] Intent was not an element of the aggravating circumstance provided by the criminal statute at issue in *State* v. *McCalpine*, 190 Conn. 822, 463 A.2d 545 (1983), which stated that a person was "guilty of robbery in the first degree when, in the course of the commission of the crime or of immediate flight therefrom, he *or another participant in the crime* . . . is armed with a deadly weapon." (Emphasis added.) General Statutes § 53a-134 (a) (2). That statute, we noted, "imposes vicarious liability on a defendant when he commits a robbery with another person who, although unbeknownst to him, is armed with a deadly weapon." Id., 831 n.7. The accessory statute's requirement that the defendant act "with the mental state required for commission of an offense" drops out of the calculation when the aggravating circumstance does not require proof of any particular mental state. General Statutes § 53a-8.

to the more serious crime of burglary in the first degree by 'intentionally, knowingly or recklessly' inflicting or attempting to inflict bodily injury on anyone, each participant in the burglary is guilty of the aggravated offense and it is without significance that such other participant was without knowledge of the other's conduct which caused the physical injury or that he himself had no intention to cause such injury." Id., 506–507. This court found "no error in this portion of the court's charge." Id., 507. The rule of law discussed in *McCalpine* was not, however, the basis of the defendant's challenge to the instruction in *Parham*. Rather, the defendant objected to this portion of the charge by "arguing that the statute required that to be found guilty of the aggravated offense the defendant—as opposed to an accomplice or coparticipant—must inflict or attempt to inflict bodily injury." Id. Although the defendant claimed error in the jury charge regarding intent, the opinion in *Parham* does not describe the gravamen of this claim. It may have been wedded to his claim, which the court found unpersuasive, that he personally would have to be proven to have at least attempted to inflict bodily injury. It therefore is not clear whether *Parham* supports the proposition stated in dictum in *McCalpine,* that an accessory need not be proved to possess the intent to commit the specific degree of the crime charged.[12]

When we revisited the intent question in *State* v. *Foster,* 202 Conn. 520, 522 A.2d 277 (1987), the issue was,

---

[12] We also note that the jury appears to have been instructed on the accessory statute's requirement that an accessory be proven to act "with the mental state required for commission of an offense." General Statutes § 53a-8; see *State* v. *Parham,* 174 Conn. 500, 507, 391 A.2d 148 (1978). The court did not tell the jury that it would not be necessary for it to find the defendant to have been at least reckless, but only that the defendant need not have *known of* or *intended* bodily injury. The jury instructions, therefore, were not necessarily inconsistent with the proposition that to convict for accessorial liability the state must prove that the accessory had the mental state required for the charged degree of the substantive offense.

as in this case, the sufficiency of the evidence of guilt. In this context, without expressly overruling our statements in *McCalpine* or *Parham,* we held that "accessorial liability is predicated upon the actor's state of mind at the time of his actions, and whether that state of mind is commensurate to the state of mind required for the commission of the offense." *State* v. *Foster,* supra, 532. Emphasizing that "accessorial liability is not a distinct crime, but only an alternative means by which a substantive crime may be committed"; id.; we concluded that "a person may be held liable as an accessory . . . if he has the requisite culpable mental state for the commission of the substantive offense . . . ." Id., 533. Moreover, we observed that Connecticut's accessory statute represents "the same approach" as that of the Model Penal Code, and quoted with approval the code's position on the requisite intent of an accessory: " '[C]omplicity in conduct causing a particular criminal result entails accountability for that result so long as the accomplice is personally culpable with respect to the result to the extent demanded by the definition of the crimes. Thus, if the accomplice recklessly endangers life by rendering assistance to another, he can be convicted of manslaughter if death results, even though the principal actor's liability is at a different level. In effect, therefore, the homicidal act is attributed to both participants, with the liability of each measured by his own degree of culpability toward the result.' " *State* v. *Foster,* supra, 533–34 n.14, quoting Model Penal Code § 2.06, comment 7.[13]

---

[13] Section 2.06 (7) of the Model Penal Code provides: "An accomplice may be convicted on proof of the commission of the offense and of his complicity therein, though the person claimed to have committed the offense has not been prosecuted or convicted or has been convicted of a different offense *or degree of offense* or has an immunity to prosecution or conviction or has been acquitted." (Emphasis added.) The accompanying comment states: "[I]t is submitted that the liability of an accomplice ought not to be extended beyond the purposes that he shares. Probabilities have an important evidential bearing on these issues; to make them independently sufficient is to

Taking a literal view of the plain language of the accessory statute, in effect we agreed with the position taken by Justice Shea, in his concurring opinion in *State* v. *McCalpine,* supra. Noting that "the mental state required of an accomplice who is charged with a crime [cannot be] less than that which must be proved against a principal"; id., 833; Justice Shea had argued that "[t]his requirement must extend to those acts which enhance the degree of the crime as well as to those which constitute the basic crime itself. Otherwise an accomplice might be convicted of an offense although he did not entertain the same mental state required by statute for conviction of the principal." Id., 834.[14]

We need not decide today whether the holding of *State* v. *Foster,* supra, can be reconciled with all of the language in *State* v. *Parham* and *State* v. *McCalpine.* In this case, the trial court in its jury instructions did not adopt the *McCalpine* dictum or use the language that had been used in *Parham.* Rather, the jury was told that the statute's "reference to the mental state required means that the alleged accessory must have the same intent to commit the crime that is required of the actual perpetrators of the crime." Again: "The

predicate the liability on negligence when, for good reason, more is normally required before liability is found. More extensive liability for consequences may be defensible in special situations; if so, the liability should be created by the section dealing with the special situation, not comprehended in a principle designed for application throughout the Code." Model Penal Code § 2.06, comment 6 (b), pp. 312–13.

[14] Nothing in *State* v. *Foster,* 202 Conn. 520, 522 A.2d 277 (1987), however, conflicts with the holding in *State* v. *McCalpine,* 190 Conn. 822, 463 A.2d 545 (1983), that when a defendant is charged with robbery in the first degree on the basis that "he or another participant in the crime . . . is armed with a deadly weapon"; General Statutes § 53a-134 (a) (2); the defendant need not be proven to have intended to possess a deadly weapon. The concurrence in *McCalpine* also disagreed with that proposition, but it has not been questioned in any decision by this court.

third element is that while in the course of committing an offense, he intentionally, knowingly, or recklessly inflicted or attempted to inflict bodily injury on a person; and the allegation here is that that person was Chesley Smith." Other parts of the instruction clarified that the person alleged actually to have injured Smith was Howard and not the defendant, and that the defendant was alleged to have importuned or intentionally aided Howard. None of this language, however, was contrary to the more specific instruction concerning the defendant's mental state. The instruction that was given required that the defendant be proven to have been at least reckless with respect to Howard's infliction of bodily injury on Chesley Smith.

The evidence was sufficient to support a conviction based on that instruction. The jury could reasonably have found the following facts. The defendant knew before he entered the house that a gun was being wielded by his accomplices. He knew that the purpose of the gun was to facilitate the robbery of the $15,000. He knew that there were people in the house against whom the gun might be used. The jury could reasonably have inferred that the danger to those people mattered less to him than the money that he might gain in the robbery. Although the evidence at trial showed that the defendant was elsewhere in the apartment when Howard assaulted Smith, the jury was entitled to find that the defendant consciously disregarded the substantial risk that the gun would be used to injure someone in the robbery. To prove his recklessness, it was no more necessary to show that he was aware of the risk to the specific person who was injured than it would have been to make such a showing had he fired a rifle into a crowd. We therefore affirm the defendant's conviction on this count.

## D

With respect to the charge of conspiracy to commit burglary in the first degree under General Statutes §§ 53a-101 (a) (2) and 53a-48, the defendant maintains that the state failed to prove an agreement to inflict bodily injury on anyone. We agree. Although, as noted above, the evidence was sufficient to show that the defendant recklessly engaged in the course of conduct that led to Chesley Smith's injuries, the evidence does not show that those injuries were planned or intended. We held in *State* v. *Foster,* supra, that intent need not be shown in order to hold a person liable as an accessory to a criminally negligent act as long as he has the requisite mental state for the commission of the substantive offense and he intentionally aids another in the crime. We explained that this result was consistent with our earlier holdings, in *State* v. *Almeda,* 189 Conn. 303, 455 A.2d 1326 (1983), and *State* v. *Beccia,* 199 Conn. 1, 505 A.2d 683 (1986), that "persons cannot attempt or conspire to commit an offense that requires an unintended result." *State* v. *Foster,* supra, 526–27. The defendant's conviction on this count must therefore be set aside.

## E

With respect to the final count, being an accessory to the offense of assault in the second degree in violation of General Statutes §§ 53a-60 (a) (2) and 53a-8, the state was required to prove that the defendant intended "to cause physical injury to another person" and that he importuned or intentionally aided another in causing physical injury by "means of a . . . dangerous instrument." The defendant maintains that there was no evidence that he intended to inflict physical injury on anyone.

The state maintains that the defendant was an accomplice to Howard's assault on Smith. Although the defendant was not present at the time of this assault, and there was no evidence that such an assault had been planned, the state maintains that such an assault was an inherent risk that the defendant assumed when he actively participated with Howard and Holmes in the robbery and the burglary. The state relies on *State* v. *Rossi,* 132 Conn. 39, 44, 42 A.2d 354 (1945), in which this court opined, in construing a predecessor to our felony murder statute, that "crimes against the person like robbery . . . and burglary are, in common experience, likely to involve danger to life in the event of resistance by the victim or the attempt of the perpetrator to make good his escape and conceal his identity." *Rossi* is not, however, a persuasive precedent, because the statute there being construed and applied did not require a finding of wilful, deliberate or premeditated conduct. See id.

The accessory statute required the state to prove that the defendant had the mental state necessary to commit assault in the second degree. Although General Statutes § 53a-60 (a) (3) provides that a person is guilty of assault in the second degree when "he recklessly causes serious physical injury to another person by means of a deadly weapon or a dangerous instrument," the jury in this case was not instructed on this part of the statute, but only on those parts that require intent to cause injury. In the absence of any probative evidence showing such intent, the defendant's conviction on this count must be set aside and an acquittal entered.

## II

The defendant also challenges the legal sufficiency of the count of the substitute information charging him with burglary in the first degree. He maintains that the information was so defectively drafted that it either

(a) deprived the trial court of subject matter jurisdiction to try him for this offense, or (b) misled the jury into convicting him of this offense without a finding about an essential element of the crime.

The original information in this case charged the defendant in an eight count form that listed, for each crime, the statute or statutes that the defendant was alleged to have violated. At the request of counsel for Howard, the state substituted a long form information, in which the third count accused the defendant "of the crime of Burglary in the First Degree in violation of Connecticut General Statutes §§ 53a-101 (a) (2), 53a-8, and alleges that at the same approximate time, with intent that 397 Blue Hills Avenue, Hartford be unlawfully entered and/or remained in, the defendant unlawfully entered and/or remained therein, importuned and/or intentionally aided another to do so, and that in the course of the offense, Everald Howard inflicted or attempted to inflict injury upon Chesley Smith." Despite a specific inquiry from the court at the time that the state filed the substitute information, the defendant voiced no objection to its contents. He now maintains, however, that the substitute information was fatally defective because it did not expressly charge the defendant with having had the intent to commit a crime when he unlawfully entered and remained in the victims' home. We disagree.

The defendant's jurisdictional claim attacks only the validity of the substitute information. It is settled law that the original information, because it set forth by name and statutory reference the crime with which the defendant was charged, was sufficient to invoke the jurisdiction of the court. *State* v. *Ruiz,* 171 Conn. 264, 270, 368 A.2d 222 (1976). The defendant does not explain in what manner the court could have lost jurisdiction by the filing of a substitute information in response to a request for a bill of particulars. Even the

federal cases on which the defendant relies do not permit an attack on the jurisdictional sufficiency of an information to be mounted after trial. Compare *Kaneshiro* v. *United States,* 445 F.2d 1266, 1269 (9th Cir.), cert. denied, 404 U.S. 992, 92 S. Ct. 537, 30 L. Ed. 2d 543 (1971) (rejecting objection raised for the first time on appeal), with *United States* v. *Hooker,* 841 F.2d 1225, 1229 (4th Cir. 1988) (vacating conviction where indictment was objected to before trial). We conclude, therefore, that the defendant's jurisdictional claim must fail. Compare *State* v. *Roque,* 190 Conn. 143, 156, 460 A.2d 26 (1983); *State* v. *Coleman,* 167 Conn. 260, 280–81, 355 A.2d 11 (1974) *(Bogdanski, J.,* concurring).

The defendant's alternate contention is that the terms of the substitute information might have misled the jury[15] into convicting him of burglary in the first degree without finding that he had the requisite intent to commit this crime. During its deliberations, the jury asked the trial court for further guidance about the specific elements of the numerous crimes that Howard and the defendant had been charged with committing. After a conference with counsel, at which Howard's counsel asked the court to remind the jury that the substitute information had no evidentiary role in its deliberations, the court summarized the elements of the eight crimes for the jury. The defendant concedes the accuracy of this supplemental charge. He maintains, however, that the jury might have disregarded this accurate instruction, and relied instead on the contents of the substitute information, because of the court's supplemental charge about this information. The court reminded the jury that the information was "not law . . . not even facts. . . . It's an allegation. It is not anything that you follow other than to read it in the light for which it is intended, essentially [describing] what the State

---

[15] The defendant does not allege that he was misled about the elements of the crime with which he was charged.

alleges happened at the time and place of these alleged crimes." The defendant did not take exception to any portion of the supplemental charge.

On this record, the defendant has not made a credible showing that the jury was misled by the failure of the substitute information to state each element of the crime of burglary in the first degree. Read as a whole, the court's original charge and supplemental charge gave the jury constitutionally adequate guidance for its deliberations. At best, the defendant's belated dissection of the supplemental charge with regard to the jury's use of the substitute information raises an evidentiary rather than a constitutional issue. Since this issue was not distinctly raised in the trial court, we decline to address it further. See Practice Book § 4185.

### III

The defendant was convicted of two conspiracies, a conspiracy to commit robbery in the first degree and a conspiracy to commit burglary in the first degree. Since both of these conspiracy convictions arise out of the same alleged agreement, the defendant contends that these convictions violate the prohibition against double jeopardy contained in the fifth amendment to the United States constitution and article first, § 8 of the Connecticut constitution. See *State* v. *Howard,* supra, 460–63. In light of our conclusion that the defendant is, for reasons of evidentiary insufficiency, entitled to acquittal on the second of these conspiracy counts, we need not pursue this contention.

### IV

The defendant contends that he is entitled to a new trial because of the allegedly erroneous admission into evidence of identifications made by Smith and Hutchinson. He contends that their identifications of him, both pretrial and at trial, resulted from an impermis-

sibly suggestive photographic array and should have been suppressed as unreliable and violative of his due process rights under the state and federal constitutions. The trial court admitted these identifications into evidence, despite its finding that the photographic array had been unnecessarily suggestive, because it found the identifications reliable in light of the totality of the circumstances. See *Manson* v. *Brathwaite,* 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977); *State* v. *Ramsundar,* 204 Conn. 4, 10–11, 526 A.2d 1311, cert. denied, 484 U.S. 955, 108 S. Ct. 348, 98 L. Ed. 2d 374 (1987).

In *State* v. *Howard,* supra, 451–56, having examined in detail the applicable law and the testimony of the witnesses, we upheld the trial court's finding that the witnesses had reliably identified Howard. The defendant urges us to come to a different conclusion in his case because he wore a mask while he was at the apartment, while Howard was barefaced.

Although the witnesses had less of an opportunity to observe the defendant than to observe Howard, their identifications were nonetheless sufficiently reliable to pass constitutional muster. Both were able to see the defendant for several minutes, at a time when their attention was as much directed to him as to his confederates. Their descriptions of the perpetrators to the police, while somewhat general, matched Howard and the defendant, especially with regard to the distinctive hairstyle worn by both men. See id., 455 n.8. Their photographic identifications were positive once they had covered the lower part of the photograph to recreate what they had observed at the scene of the crime.

The defendant bears the burden of proving the unreliability of his identification by Smith and Hutchinson. *State* v. *Payne,* 219 Conn. 93, 108, 591 A.2d 1246 (1991); *State* v. *Mayette,* 204 Conn. 571, 581, 529 A.2d

673 (1987). We concur with the trial court that the defendant has not met this burden and that the court, therefore, properly admitted these identifications into evidence.

## V

The defendant's final claim arises out of the decision of the trial court denying him access to Holmes' psychiatric records. The defendant cross-examined Holmes extensively concerning her involvement with drugs, and sought the psychiatric information in order to impeach her credibility on this issue. The trial court, with Holmes' consent, undertook an in camera inspection of Holmes' records from the Cedarcrest Regional Hospital. As a result of its examination of the records, the trial court ruled that "there is nothing in these records that remotely relate[s] to the witness' capacity to testify, to her credibility, [or to] any facts bearing on her reliability or sense of perception, and in short, they have no probative value . . . as to her ability to relate the truth or to observe or recollect and narrate relevant occurrences." The trial court sealed the psychiatric records to enable appellate review of its ruling, but did not permit the defendant to undertake his own inspection. The defendant properly reserved his objection to the court's ruling. He now renews his claim that the trial court's ruling constituted an abuse of its discretion. We disagree.

This issue also was fully explored in *State* v. *Howard,* supra, 456–58. The applicable legal principles have often been stated. If a witness consents to an inspection of his or her psychiatric records in camera, the trial court must determine, in its discretion, "whether the records are especially probative of the witness' capacity to relate the truth or to observe, recollect and narrate relevant occurrences." *State* v. *D'Ambrosio,* 212 Conn. 50, 58, 561 A.2d 422 (1989), cert. denied, 493

U.S. 1063, 110 S. Ct. 880, 107 L. Ed. 2d 963 (1990); *State* v. *McMurray,* 217 Conn. 243, 257, 585 A.2d 677 (1991). The findings of the trial court correctly addressed not only Holmes' testimonial capacity but also her credibility. Our independent review of the psychiatric records confirms the propriety of the trial court's ruling. "We are convinced that nothing in the [psychiatric] records would have added weight to the defendant's thorough cross-examination of Holmes and that the trial court properly exercised its discretion in denying the defendant access to those privileged records." *State* v. *Howard,* supra, 458.

The judgment is reversed in part and the case is remanded to the trial court with direction to modify the judgment to reflect an acquittal of the crime of conspiracy to commit burglary in the first degree and an acquittal of the crime of assault in the second degree, and to resentence the defendant in accordance with the modified judgment.

In this opinion GLASS and BERDON, Js., concurred.

BORDEN, J., with whom CALLAHAN, J., joins, dissenting in part. I decline to join part of the discussion in part I C of the majority opinion regarding the conviction of the defendant of burglary in the first degree, as an accessory. Furthermore, I disagree with the conclusion in part I D, reversing the conviction of the defendant of conspiracy to commit burglary in the first degree, and with the conclusion in part I E, reversing the conviction of the defendant of assault in the second degree, as an accessory.

I decline to join that part of the discussion in part I C regarding the scope and meaning of *State* v. *Parham,* 174 Conn. 500, 391 A.2d 148 (1978). Although I agree with the majority that the defendant's conviction as an accessory to burglary in the first degree

should be affirmed, I do not think that it is necessary to consider or to cast doubt on the viability or scope of *Parham*. As the majority points out, the trial court did not charge on the *Parham* principle in this case. I see no need, therefore, for the majority's exegesis calling it into question. Moreover, in contrast to the majority's cramped reading of that case, I read *Parham*, on its facts and reasoning, to stand squarely for the principle that "when more than one person participates in a burglary in the course of which one participant commits an act which raises the offense to the more serious crime of burglary in the first degree by 'intentionally, knowingly or recklessly' inflicting or attempting to inflict bodily injury on anyone, each participant in the burglary is guilty of the aggravated offense and it is without significance that such other participant was without knowledge of the other's conduct which caused the physical injury or that he himself had no intention to cause such injury." Id., 507. Indeed, on the facts of *Parham*, where the victim could not identify which of the two burglars actually inflicted the bodily injury on her, that principle is the only way in which Parham's conviction of burglary in the first degree could have been upheld.

In part I D, the majority reverses the defendant's conviction of conspiracy to commit burglary in the first degree because "the evidence does not show that [bodily] injuries were planned or intended." I disagree, for two reasons. First, purely as a matter of drawing reasonable inferences, it seems to me quite evident that where, as in this case, the defendant agreed with his coconspirators to steal $15,000 from a house which he knew to be inhabited by a group of people, and thus to be guilty of robbery, and where he knew that one of his cohorts was armed with a revolver, it was reasonable for the jury to infer that he intended that the revolver be used in a manner involving bodily injury

if necessary to accomplish the robbery. Surely, it was reasonable for the jury to infer that his state of mind went beyond recklessness, and beyond a recognition that the revolver would be used only to intimidate his intended victims, and included an intent that, as actually happened, it be used to cause injury.

Second, the conviction on this count is for conspiracy to commit burglary in the first degree. It was necessary that the state establish only the requisite agreement and overt act. I can see no difference between the validity of this conviction and the conviction of conspiracy to commit robbery in the first degree that the majority sustains in part I B of the opinion. In both, to quote from the majority opinion, "[t]he applicable principle of the law of criminal conspiracy was delineated in *State* v. *Ghere,* [201 Conn. 289, 299, 513 A.2d 1226 (1986)], in which, relying on *State* v. *Holmes,* 160 Conn. 140, 150, 274 A.2d 153 (1970), we held that the requisite agreement or confederation may be inferred from proof of the separate acts of the individuals accused as coconspirators and from the circumstances surrounding the commission of these acts." Furthermore, we have long held that "the existence of [a] conspiracy for [an] original felony renders [one] responsible for the natural and probable results of the execution of that original felony." *State* v. *Cots,* 126 Conn. 48, 59, 9 A.2d 138 (1939).

Finally, in part I E, the majority reverses the defendant's conviction of assault in the second degree, as an accessory, because, as the majority sees the evidence, he had no intent to cause injury. The accessory statute does not require, however, that he had the intent that he himself cause the injury, only that he acted "with the mental state required for commission of an offense"; General Statutes § 53a-8; which, in this case, was the intent that injury be caused by the principal. Under all the circumstances, it was reasonable for the

jury to infer that, when the defendant entered this inhabited home with the intent to rob the inhabitants, and when he knew that one of his cohorts was armed with a revolver, he had the intent that the revolver would be used to cause injury to someone if necessary to carry out the robbery.

I therefore dissent from part I D and E of the majority opinion, and would affirm the judgment of conviction on those counts.