STATE OF CONNECTICUT *v.* CRISTOBAL
MILLAN, JR.
(SC 18214)

Norcott, Katz, Palmer, Vertefeuille and Schaller, Js.

Argued November 20, 2008—officially released March 24, 2009

*Glenn W. Falk,* special public defender, for the appellant (defendant).

*Laurie N. Feldman,* special deputy assistant state's attorney, with whom, on the brief, were *John A. Connelly,* state's attorney, and *Eva Lenczewski,* supervisory assistant state's attorney, for the appellee (state).

*Opinion*

KATZ, J. The defendant, Cristobal Millan, Jr., appeals[1] from the judgment of conviction, rendered after a jury trial, of assault in the first degree in violation of General Statutes § 53a-59 (a) (1)[2] and conspiracy to commit assault in the first degree in violation of General Statutes §§ 53a-48[3] and 53a-59 (a) (1). The defendant claims on appeal that: (1) there was insufficient evidence to support the conspiracy conviction under § 53a-59 (a) (1); and (2) the admission of uncharged prior misconduct evidence was harmful error. We affirm the trial court's judgment.

---

[1] The defendant appealed from the trial court's judgment to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ."

[3] General Statutes § 53a-48 provides: "(a) A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy.

"(b) It shall be a defense to a charge of conspiracy that the actor, after conspiring to commit a crime, thwarted the success of the conspiracy, under circumstances manifesting a complete and voluntary renunciation of his criminal purpose."

The jury reasonably could have found the following facts. On March 21, 2005, Lamarr Sands and his girlfriend, Charie Matos, were staying at the Super 8 Motel (motel) located at the intersection of Scott Road and Schraffts Drive in Waterbury. They had been staying there for several weeks, most recently in room 215. Unbeknownst to Sands and Matos, by coincidence, Darren Madison, a friend with whom Sands recently had had a falling out, was staying in room 214 of the motel on that date. Rooms 214 and 215 are immediately adjacent to each other, their doors only one to two feet apart. The rooms are located on the second floor of the motel and are accessible only by exterior hallways and stairwells.

Sometime during that evening, Sands and Madison encountered each other at the motel. Subsequently, at approximately 10 p.m. that same evening, Jeffrey Smith arrived at the motel to visit Sands and Matos. Smith observed Sands and Madison engaged in a heated argument either in the hallway outside rooms 214 and 215 or inside of room 214. Madison left the motel after making a comment that indicated to Smith and Sands that he was going to return after meeting or picking up his "boys." Smith remained at the motel out of concern that Sands would be outnumbered in a fight upon Madison's return.

After Madison left the motel, he drove to the Save-A-Lot store on North Main Street in Waterbury, where the defendant, with whom Madison was friends, worked as a stocker. As a stocker, the defendant regularly used a "cutting blade," commonly referred to as a box cutter (hereinafter knife), that his employer provided for cutting plastic wrapped pallets or boxes. The knife had a retractable razor, with one sharpened edge that came to a point, housed in a thin plastic casing. Madison picked the defendant up following his shift at approximately 10 p.m. and, at some point before the two arrived

back at the motel, Madison told the defendant about the previous encounter with Sands. The defendant was carrying his work issued knife in his back pocket. While they were in Madison's car or shortly after they arrived back at the motel, the defendant telephoned Valerie Vicente, a friend with whom he recently had become more intimate. Vicente told the defendant that she was with two male friends. The defendant asked Vicente to come to the motel with the two males.

Soon thereafter, Madison, the defendant, Vicente and her two male friends stood outside of Sands' motel room. At least one of the persons in that group began banging on the door to Sands' room and taunted him to come out. The banging continued for several minutes. When the taunts turned to sexual comments about Matos, Sands could not restrain himself any longer and went into the hallway to confront Madison. Smith followed Sands into the hallway. Sands swung at Madison, and the two started fighting. As the defendant and one of Vicente's male friends moved to join in the fight, Smith told them not to intervene and that the fight was between Sands and Madison. The defendant then swung his fist toward Smith. In response, Smith grabbed the defendant, held him in a "reverse headlock"—the defendant facing Smith with his head down—and punched the defendant with uppercuts, bloodying the defendant's nose. Smith and the defendant fell backwards onto the floor of Sands' motel room, where they stopped fighting and got to their feet. Smith offered the defendant his hand, saying that this was not "their fight . . . ." At that point, one of Vicente's male friends who was in the motel room remarked to the defendant that Smith "had messed [the defendant] up pretty bad." The defendant looked in the mirror, saw his bloodied nose and pulled the knife out of his pocket. Smith took a step back, and the defendant yelled to the other male to hit Smith with a desk chair that was in the room.

The male picked up the chair and grazed Smith with it. Smith ducked to avoid being hit by the chair, and his feet became entangled in the comforter hanging from the bed, causing Smith to fall to the floor on his knees and elbows. The defendant then went over to Smith, stood behind and over him and began slashing him with the knife. The other male who had swung the chair at Smith yelled to the defendant, "slash his throat, slash his throat." Smith remained on his knees and tried to protect his throat and face with his arms, as the defendant continued to slash him.

At some point while the defendant and Smith fought, the fight between Sands and Madison ended. The defendant stopped slashing Smith, left the motel room and drove away from the motel with Madison. Madison drove the defendant to a nearby gas station, where the defendant washed up, changed his bloodied shirt into a clean one that Madison gave him and threw away the knife. Thereafter, the defendant fled the state and went to his father's house in Virginia, where police eventually located him.

The morning after the assault, Smith sought treatment at Waterbury Hospital because his wounds would not stop bleeding. An examination revealed that he had sustained seven slash or stab wounds—two to his head, which cut his forehead and ear, one to his chin, one to the back of his head, two to his back and one to his upper abdomen and chest. Some of the cuts went into the subcutaneous tissue, which is below the layer of fatty tissue that lies directly below the skin. One of the cuts to Smith's head had severed his temporal artery. As a result, by the time he arrived at the hospital, Smith had lost approximately two pints of blood, or 15 to 20 percent of his total blood volume.

The record reveals the following additional undisputed facts and procedural history. At trial, over the

defendant's objection, the state introduced the following evidence through testimony from Matos and Sands regarding the incident that had led to the falling out between Sands and Madison. Sometime in early 2005, before the incident at the motel, Sands and Matos were sitting in Sands' car at the Fairmount Projects in Waterbury when Madison pulled up next to them in his car. The defendant and another male got out of Madison's car, pulled Sands from his car to the ground, assaulted him and took his gold bracelet and money. Madison watched from his car and laughed while the incident occurred.

The defendant thereafter testified, claiming that he had acted in self-defense when he slashed Smith. Specifically, he testified that Smith had been the initial aggressor and that he had used his knife against Smith while Smith had him in the headlock, after he had been unable to break free and was being choked by the headlock. The jury returned a verdict of guilty on one count of assault in the first degree in violation of § 53a-59 (a) (1), with Smith being the victim of the assault, and one count of conspiracy to commit assault in the first degree in violation of §§ 53a-48 and 53a-59 (a) (1), with Sands being the victim of the conspiracy.[4] The trial court rendered judgment in accordance with the verdict and imposed a total effective sentence of fourteen years imprisonment and six years special parole. This appeal followed.

---

[4] By way of long form information, the state had charged the defendant in count one with assault in the first degree in violation of § 53a-59 (a) (1) (intentional assault with a dangerous instrument), in count two with assault in the first degree in violation of § 53a-59 (a) (3) (reckless assault), in count three with conspiracy to commit assault in the first degree in violation of §§ 53a-48 and 53a-59 (a) (1), and in count four with conspiracy to commit assault in the third degree in violation of General Statutes §§ 53a-48 and 53a-61 (a) (1). The trial court had instructed the jury that counts two and four were alternative counts to counts one and three, respectively. Accordingly, the jury returned verdicts only on counts one and three.

The defendant contends that (1) there was insufficient evidence of an agreement to use a dangerous instrument to support the conspiracy charge, and (2) the trial court improperly admitted the prior uncharged misconduct evidence relating to his involvement in Sands' assault at the Fairmount Projects. We reject both claims.

I

We first address the defendant's claim that there was insufficient evidence to support his conviction of conspiracy to commit assault in the first degree in violation of §§ 53a-48 and 53a-59 (a) (1). As charged to the jury, the state was required to prove that the defendant was a party to an agreement to assault Sands with a dangerous weapon. The defendant contends that the evidence does not show that anyone else knew, prior to the fight, that he possessed a dangerous instrument, and, therefore, there was no direct or circumstantial evidence of an agreement to carry out an assault with a knife or any other kind of dangerous instrument. The state responds that there was sufficient evidence to support this conviction. In addition to evidence relating to the knife, the state points to evidence that one of the assailants swung a chair at Smith. The state also urges us to adopt the position taken by some jurisdictions, under which body parts can be a dangerous instrument under certain circumstances, and to conclude that the jury properly could have found that the "multiple fists" of the conspirators in the present case constituted a dangerous instrument under General Statutes §§ 53a-3 (7)[5] and 53a-59 (a) (1). In his reply brief, the defendant contends that

[5] General Statutes § 53a-3 provides in relevant part: "Except where different meanings are expressly specified, the following terms have the following meanings when used in this title . . .

"(7) 'Dangerous instrument' means any instrument, article or substance which, under the circumstances in which it is used or attempted or threatened to be used, is capable of causing death or serious physical injury . . . ."

we should disregard the state's "multiple fists as a dangerous instrument" argument because the trial court offered no such instruction to the jury.

We conclude that there was sufficient evidence to prove that there was a conspiracy to commit assault with a knife. Therefore, we need not decide whether multiple fists can constitute a dangerous instrument under §§ 53a-3 (7) and 53a-59 (a) (1), an issue of first impression in this state[6] and one on which the jury did not receive an express instruction in the present case.[7]

[6] Although we express no opinion as to whether multiple fists can be a dangerous instrument under our Penal Code, we note that the state asserts that this question was one of fact for the jury under the circumstances of the case but does not address certain evidence that would bear on such a finding, if proper. Specifically, the state does not address the evidence, or lack thereof, regarding the relative numbers and physical attributes of the fight participants. The evidence established that the fight was four men against two and that the defendant and Madison were approximately one foot shorter and sixty-five to seventy pounds lighter than Sands. There was no evidence regarding the height or weight of Smith or Vicente's two male friends.

[7] In charging the jury on the elements of assault in the first degree for count one, the trial court stated: "The last element the state must prove beyond a reasonable doubt is that the defendant caused serious injury to [Smith] by means of a dangerous instrument." After setting forth the definition of a dangerous weapon, the court explained: "Here, the state alleges the dangerous instrument to be a knife." Later, when instructing the jury on count three, alleging conspiracy to commit assault in the first degree, the trial court stated: "The elements of assault in the first degree were explained to you in connection with the first count charging an intentional assault. The difference is that, with respect to the conspiracy count, the object of this assault is . . . Sands and not [Smith]." The court did state that the defendant's overt act in furtherance of the conspiracy was swinging a fist at Sands. Although the state contends that the trial court did not instruct the jury that the state had alleged the dangerous instrument with particularity for count three, and, therefore, the jury was free to consider anything that the facts reasonably suggested was used as a dangerous instrument, we disagree. The trial court's incorporation by reference of its earlier instruction regarding a dangerous instrument, in combination with its highlighting of only one difference between the two counts, reasonably would have led the jury to conclude that the state alleged the same dangerous instrument, the knife, as to both counts. Indeed, given that the question of whether body parts, such as multiple fists, can be a dangerous instrument is an issue of first impression and one on which other jurisdictions are

"The standard of review employed in a sufficiency of the evidence claim is well settled. [W]e apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"While the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt." (Citation omitted; internal quotation marks omitted.) *State* v. *Green*, 261 Conn. 653, 667, 804 A.2d 810 (2002). "[T]he trier of fact may credit part of a witness' testimony and reject other parts." *Hicks* v. *State*, 287 Conn. 421, 435, 948 A.2d 982 (2008).

"To establish the crime of conspiracy under § 53a-48 . . . the state must show that there was an agreement between two or more persons to engage in conduct constituting a crime and that the agreement was followed by an overt act in furtherance of the conspiracy by any one of the conspirators. The state must also show intent on the part of the accused that conduct constituting a crime be performed. The existence of

divided, undoubtedly the jury would have required some specific guidance on this issue.

a formal agreement between the parties need not be proved; it is sufficient to show that they are knowingly engaged in a mutual plan to do a forbidden act." (Internal quotation marks omitted.) *State* v. *Padua*, 273 Conn. 138, 181–82, 869 A.2d 192 (2005).

In the present case, "[w]hile the state must prove an agreement [to commit assault with a dangerous weapon], the existence of a formal agreement between the conspirators need not be proved because [i]t is only in rare instances that conspiracy may be established by proof of an express agreement to unite to accomplish an unlawful purpose. . . . [T]he requisite agreement or confederation may be inferred from proof of the separate acts of the individuals accused as coconspirators and from the circumstances surrounding the commission of these acts. . . . Further, [c]onspiracy can seldom be proved by direct evidence. It may be inferred from the activities of the accused persons." (Internal quotation marks omitted.) *State* v. *Green*, supra, 261 Conn. 669. "A conspiracy can be formed [however] in a very short time period . . . ." Id., 671.

The record reflects the following evidence. Sands testified that, in a statement to the police, he had identified the defendant as one of his attackers at the Fairmount Projects.[8] Despite that prior physical assault, testimony from Sands and Smith established that Sands nonetheless confronted Madison when he first saw him at the motel. The defendant testified that, about one-half hour before he left work, he and Madison had made arrangements for Madison to pick him up from work. He also testified that Madison had told him about the confrontation with Sands. The defendant claimed that he had called Vicente because it was his idea to get

[8] Although the defendant contests the admission of this testimony, for the reasons set forth in part II of this opinion, we conclude that this evidence properly was admitted.

"some girls" to come to the motel, yet he also testified that he told Vicente that it was okay for her to bring her two male friends along. Testimony from Smith, Sands and Matos established that, thereafter, the defendant, Madison, Vicente's two male friends and Vicente stood in the hallway outside of Sands' motel room while one or more persons in that group repeatedly knocked on the door to Sands' room and yelled taunts to provoke Sands to come out of his room. Sands testified that someone said: "Come the fuck outside. . . . Just come outside now. We all here now, bitch." Matos testified, on the basis of her knowledge of the previous incident at the Fairmount Projects and the conduct that both preceded and occurred during the fight at the motel, that she believed that "[t]he three of them came to our room to jump [Sands]," apparently referring to Madison, the defendant and one of Vicente's male friends. Smith testified that, after Sands came out from his motel room and started to fight with Madison, the defendant swung his fist at Smith after Smith interfered with the defendant's effort to enter the fray between Sands and Madison. Smith also testified that, when the defendant pulled out his knife, the defendant yelled to one of Vicente's male friends to hit Smith with a chair. The male then attempted to do so, and later yelled to the defendant, "slash his throat, slash his throat." The defendant testified that, after he and Madison left the motel, Madison drove him to a gas station, where the defendant cleaned up and disposed of the knife, and Madison provided the defendant with a clean shirt that he had in his car.

On the basis of this testimony, the jury reasonably could have drawn the following inferences. Before or shortly after the defendant got out of work, the defendant and Madison had formed a plan to go back to the motel to assault Sands. Sands' willingness to confront Madison indicated that he had not been sufficiently intimidated by the earlier assault at the Fairmount Proj-

ects. Additionally, Madison had reason to believe that, when he returned to the motel, Smith still would be there with Sands. Therefore, the defendant and Madison reasonably anticipated that greater force than fists would be necessary. The defendant had ready access to the knife that he regularly used for his job and brought it with him to the motel. The defendant telephoned Vicente with the intention of rounding up additional people to confront Sands or formed that intention once he found out that Vicente had two male friends with her. The defendant and Madison had the opportunity to communicate their plan to Vicente's friends before they went to Sands' motel room. The presence of Vicente's two male friends outside of Sands' motel room when one or more persons in Madison's group banged on the door and taunted Sands demonstrated that they were aware of a dispute between Madison and Sands and, at the very least, passively participated in efforts to get Sands out of the room for purposes of the assault. Cf. *State* v. *Green*, supra, 261 Conn. 671 (no evidence of agreement to kill when no evidence that alleged conspirators who shot at victim knew about dispute between victim and defendant).

Most significant, however, was the conduct of the defendant's alleged coconspirators after the defendant pulled the knife out of his pocket. A coconspirator's conduct at the scene can provide the requisite evidence of an agreement. See *State* v. *Crosswell*, 223 Conn. 243, 256, 612 A.2d 1174 (1992) ("[T]he requisite agreement or confederation may be inferred from proof of the separate acts of the individuals accused as coconspirators and from the circumstances surrounding the commission of these acts. . . . The fact that the defendant stood by silently when a gun was displayed in order to gain entry and then to intimidate the occupants of the premises is evidence from which the jury might reasonably have inferred the defendant's acquiescence in this

enlarged criminal enterprise." [Citation omitted.]); *State* v. *Asberry*, 81 Conn. App. 44, 51–52, 837 A.2d 885 (sufficient evidence of agreement to commit assault in first degree with dangerous weapon when coconspirator used brick found at scene to beat victim and kicked victim because "the jury reasonably could have inferred that [the coconspirator] and the defendant had agreed that the victim would be beaten up by using whatever dangerous instruments might appear at the scene"), cert. denied, 268 Conn. 904, 845 A.2d 408 (2004). The fact that the coconspirators' role in perpetrating the crime may be minimal does not negate their agreement to participate in the crime. See *State* v. *Forde*, 52 Conn. App. 159, 168, 726 A.2d 132 ("[T]he size of a defendant's role does not determine whether that person may be convicted of conspiracy charges. Rather, what is important is whether the defendant willfully participated in the activities of the conspiracy with knowledge of its illegal ends. . . . Participation in a single act in furtherance of the conspiracy is enough to sustain a finding of knowing participation." [Internal quotation marks omitted.]), cert. denied, 248 Conn. 918, 734 A.2d 567 (1999).

When the defendant pulled out his knife, the unidentified male friend of Vincente who was in the room did not say or do anything to indicate surprise or concern. On the contrary, that male attempted to immobilize Smith by hitting him with the chair to facilitate the defendant's attack and encouraged the defendant to use the knife in a lethal manner, yelling "slash his throat, slash his throat." In addition, the fact that Madison had an extra shirt in the car and aided the defendant in disposing of the knife could support the conclusion that there had been a prearranged plan. In sum, the jury reasonably could have concluded that the coconspirators' intention was to do to Sands what ultimately was done to Smith after Smith had interfered with Madison's

assault on Sands. We therefore conclude that the evidence in the present case was sufficient to support a finding that the defendant had conspired with Madison and one of Vicente's male friends to commit assault in the first degree with a dangerous instrument.

II

The defendant also contends that the trial court's admission of the prior misconduct evidence relating to his role in Sands' assault at the Fairmount Projects was harmful error. Specifically, he contends that this evidence was not relevant to whether he had intended to assault Smith or had acted in self-defense. He further contends that the prejudicial effect of this evidence outweighed any probative value that it had. We disagree.

The principles guiding our review of a trial court's decision to admit prior uncharged misconduct evidence are well settled. "Evidence of a defendant's uncharged misconduct is inadmissible to prove that the defendant committed the charged crime or to show the predisposition of the defendant to commit the charged crime. . . . Exceptions to this rule have been recognized, however, to render misconduct evidence admissible if, for example, the evidence is offered to prove intent, identity, malice, motive, a system of criminal activity or the elements of a crime." (Internal quotation marks omitted.) *State* v. *Tate*, 85 Conn. App. 365, 382, 857 A.2d 394, cert. denied, 272 Conn. 901, 863 A.2d 696 (2004); accord *State* v. *Jacobson*, 283 Conn. 618, 630, 930 A.2d 628 (2007). "To determine whether evidence of prior misconduct falls within an exception to the general rule prohibiting its admission, we have adopted a two-pronged analysis. . . . First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of such evidence must outweigh the prejudicial effect of the other crime evidence." (Internal quotation

marks omitted.) *State* v. *Colon*, 272 Conn. 106, 332, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005). "Since the admission of uncharged misconduct evidence is a decision within the discretion of the trial court, we will draw every reasonable presumption in favor of the trial court's ruling. . . . We will reverse a trial court's decision only when it has abused its discretion or an injustice has occurred." (Internal quotation marks omitted.) *State* v. *Tate*, supra, 382.

Although the defendant contends that the admission of this evidence was so harmful as to require reversal of both convictions, he does not contend that the misconduct evidence was irrelevant to his intent with respect to the conspiracy to assault Sands. Rather, he contends that it was not relevant to his actions or state of mind with respect to Smith. He fails to recognize, however, that evidence relevant to his intent to assault Sands undoubtedly was relevant to whether he also would have intended to harm someone who interfered with that assault. Additionally, evidence that the defendant previously had assaulted Sands at Madison's behest at the Fairmount Projects was relevant to the relationship between Madison and Sands and the defendant's motive at the motel on the evening of March 21, 2005, because it tended to prove that the defendant came to the motel ready to fight because he was Madison's "muscle." The evidence also tended to explain: (1) whether Smith and Sands reasonably had construed Madison's remark before leaving the motel to mean that he was going to return with "his boys"; and (2) Smith's purpose in remaining at the motel, namely, his concern that Sands would be outnumbered upon Madison's return.

With respect to whether the relevance of this evidence was outweighed by undue prejudice, we note that the defendant's sole contention to the trial court

in this regard, and, therefore, our sole focus on appeal, was that the robbery aspect of this incident would be prejudicial. See *State* v. *Allen*, 289 Conn. 550, 560 n.10, 958 A.2d 1214 (2008) ("we read [the defendant's] claim on appeal consistently with the argument he made to the trial court and thus preserved for appellate review"). We disagree that the jury would have given much weight to that aspect of the prior misconduct evidence. We note, however, that it was the defendant, not the state, who specifically mentioned the robbery in closing argument. Moreover, the defendant asked the trial court not to give a limiting instruction with regard to this evidence. He therefore cannot now complain, in essence, that he was prejudiced from the absence of such an instruction. See *State* v. *Nash*, 278 Conn. 620, 659–60, 899 A.2d 1 (2006) ("[t]he burden is on the defendant to establish that, in the context of the proceedings as a whole, the challenged testimony was so prejudicial, notwithstanding the court's curative instructions"); *State* v. *Gibson*, 270 Conn. 55, 66, 850 A.2d 1040 (2004) ("even if the trial court's failure to give a limiting instruction as to the prior uncharged misconduct evidence was error, such error was induced by the defendant"). We conclude, therefore, that the trial court did not abuse its discretion in admitting the prior misconduct evidence.

The judgment is affirmed.

In this opinion NORCOTT, PALMER and VERTEFEUILLE, Js., concurred.

SCHALLER, J., dissenting. Although I agree with the majority that the trial court did not abuse its discretion in admitting evidence of prior misconduct by the defendant, Cristobal Millan, Jr., I respectfully dissent because I conclude that the evidence was insufficient to support the defendant's conviction of conspiracy to commit

assault in the first degree in violation of General Statutes §§ 53a-48 and 53a-59 (a) (1). Accordingly, I would reverse the judgment of conviction as to that offense.

I agree with the majority's statement of the applicable law and the appropriate standard of review for this issue. In addition, I agree for the most part with the majority's statement of the pertinent facts regarding what the jury reasonably could have found. The majority's rendition of the evidence, however, is incomplete, in my view, and its construct of reasonable and logical inferences does not find support in the evidence. Without those unsupportable inferences, the evidence is insufficient to support the defendant's conviction.[1]

At the outset, it is crucial to keep in mind that the conspiracy charge is predicated on an agreement to commit an assault with a dangerous instrument against *Lamarr Sands, rather than Jeffrey Smith.*[2] To this end, the majority selects portions of the evidence that it uses to build the body of inferences that it argues the jury could have drawn "[o]n the basis of this testimony . . . ." In order to establish this prearranged plan to assault Sands with a dangerous instrument, the majority relies on two key inferences: (1) that Darren Madison had an unspecified reason to believe that Smith would still be at the motel with Sands, and that, therefore, "greater force than fists would be necessary";[3] and (2) that Madison had an extra shirt in his car and aided

---

[1] The majority does not reach the state's novel claim, accepted in some jurisdictions, that body parts, namely, multiple fists, can be a dangerous instrument under some circumstances. Because the trial court gave no instructions to the jury concerning such a claim, I do not reach that issue.

[2] With respect to the conspiracy count, the trial court charged the jury that "the object of this assault [and] subject of the conspiracy is . . . Sands and not . . . Smith."

[3] During the evening of March 21, 2005, Sands and Madison encountered each other at the motel in which they were both staying. Smith, who was visiting Sands, observed the argument. Later that evening, Madison returned to the motel with the defendant and several other individuals.

the defendant in disposing of the defendant's box cutter (hereinafter knife). Both of these inferences are nothing more than speculation and cannot be used to support the conviction.

First, the fact that Madison sought additional manpower in the form of assistance from three other males, rather than weapons, belies the notion that "greater force than fists would be necessary." In fact, there is not a shred of evidence that anyone, other than the defendant, was aware of the fact that the defendant possessed a knife until the defendant actually displayed that weapon after his initial altercation with *Smith*. Second, there was no evidence that Madison acquired the spare shirt before he picked up the defendant. The only reasonable inference, therefore, is that Madison already possessed the spare shirt *before* he had his *chance encounter* with Sands. In addition, there was no evidence that Madison had aided the defendant in disposing of the knife. The defendant testified that he and Madison had stopped at a gas station after the incident so that the defendant could buy some water to wash off his face. Although the defendant testified that he had disposed of the knife at the gas station, no evidence was presented that Madison, who exercised his fifth amendment right not to testify, was aware that the defendant did so. Moreover, because there was no evidence that Madison was aware that the defendant originally had possessed the knife, the subsequent events at the gas station shed no light on whether there was a *prearranged* plan.

The majority further overlooks other evidence vital to drawing reasonable inferences. As the state conceded in its closing argument at trial, the defendant did not pull out his knife until, in the words of the prosecutor: "[The fight] was over. And [Smith] told you he extended his hand, and instead, there was a second male nearby who made a remark about the defendant's face. He happened

to look up. . . . And there is a mirror right there. . . . The defendant looks right up, sees what's happened to his face and just flies into a rage. And . . . Smith tells you [the defendant] pulls out a knife when he catches his image in the mirror and goes to town on [Smith]."

What emerges from this undisputed evidence is that the sudden and unexpected use of the knife at that late, unanticipated stage of the fight was a unilateral action on the part of the defendant, exclusively for purposes of what had now become a personal dispute with *Smith* merely because someone called to the defendant's attention that Smith had bloodied the defendant's face.

Although I agree that evidence regarding this latter, unanticipated event suggests evidence of a conspiracy to commit assault in the first degree, the evidence suggests a conspiracy directed at *Smith*—not *Sands*. As the majority recounts, after the initial altercation between the defendant and Smith, "Smith offered the defendant his hand, saying that this was not 'their fight . . . .' At that point . . . [another male] who was in the motel room remarked to the defendant that Smith 'had messed [the defendant] up pretty bad.' . . . [T]he defendant [then] yelled to the other male to hit Smith with a desk chair . . . ." The other male "attempted to immobilize Smith by hitting him with the chair to facilitate the defendant's [knife] attack and encouraged the defendant to use the knife in a lethal manner." It may well be, therefore, that after the defendant realized that his face had been bloodied, there was evidence to show that the defendant had formed a conspiracy with the other male to assault *Smith* with a dangerous instrument, namely, the knife. See *State* v. *Green*, 261 Conn. 653, 671, 804 A.2d 810 (2002) ("[a] conspiracy can be formed in a very short time period"). Because the charge to the jury required it to determine whether there was a conspiracy to commit an assault in the first degree directed against *Sands*, and not against Smith,

whatever occurred after the initial dispute between the defendant and *Smith* has no bearing whatsoever on the original agreement to assault Sands.[4]

When the full evidentiary picture is taken into account, as it must be, the majority's construct of inferences cannot withstand close scrutiny. There was no evidence that anyone other than the defendant knew that the defendant possessed the knife until he displayed the knife *after* the initial fight was over. *State* v. *Smith*, 36 Conn. App. 483, 487–88, 651 A.2d 744 (1994) (conspiracy conviction overturned because no evidence that anyone was aware that group member happened to possess gun), cert. denied, 233 Conn. 910, 659 A.2d 184 (1995). Moreover, although the defendant had the opportunity to do so, he did not use the knife during the initial fight between Madison and Sands or when he initially attacked Smith, or even when Smith initially released the defendant after holding him in a headlock. In *State* v. *Asberry*, 81 Conn. App. 44, 51–52, 837 A.2d 885, cert. denied, 268 Conn. 904, 845 A.2d 408 (2004), the Appellate Court concluded, on the basis of inferences, that the spontaneous finding and use of a brick to assault a victim could support a conviction for conspiracy to commit assault in the first degree. That case, however, turned on the "*immediacy* with which the brick was found and used" in the course of the assault. (Emphasis added.) Id. In the present case, the defendant

---

[4] In *State* v. *Crosswell*, 223 Conn. 243, 256, 612 A.2d 1174 (1992), we upheld the conviction of a defendant for conspiracy to commit robbery in the first degree because we concluded that the defendant, by standing silently by while another coconspirator brandished a gun during the course of the robbery, acquiesced in what had then become an "enlarged criminal enterprise." In the present case, the state did not assert that brandishing the knife constituted evidence of a then enlarged criminal conspiracy directed at Sands, but, rather, that it had been the group's plan all along to use the knife to assault Sands. *Crosswell*, therefore, would support a conviction only if the conspiracy to commit assault was predicated against *Smith*, not Sands.

passed up *three opportunities* to use the knife and, instead, pulled the knife only after a chance remark following cessation of the initial fighting.

It bears emphasizing that Madison and the defendant specifically choose to assemble additional manpower to accompany them in their expedition to the motel, rather than bringing weapons. In the absence of evidence or reasonable inferences with regard to weapons, the majority relies on several cases, applied out of context in view of the relevant facts, allowing the use of inferences generally in determining conspiratorial intent. No cases, however, support the use of speculation on the basis of intervening, unplanned and spontaneous events that occur during the course of a confrontation like the one in this case. The initial fight, which took an unexpected turn after it appeared to be finished, was clearly an assault but, just as clearly, was not an assault with a dangerous instrument. Although the defendant should stand convicted of the charged lesser offense of assault in the third degree in violation of General Statutes § 53a-61 (a) (1); see footnote 4 of the majority opinion; his conviction for conspiracy to commit assault in the first degree should be reversed. For the foregoing reasons, I respectfully dissent.