******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* JACQUES LOUIS
(AC 35703)

Lavine, Keller and Pellegrino, Js.

*Argued November 30, 2015—officially released February 9, 2016*

(Appeal from Superior Court, judicial district of
Fairfield, Thim, J.)

*Alan Jay Black*, assigned counsel, for the appellant
(defendant).

*Adam E. Mattei*, assistant state's attorney, with
whom, on the brief, were *John C. Smriga*, state's attorney, and *Joseph P. Harry*, senior assistant state's attorney, for the appellee (state).

*Opinion*

LAVINE, J. The defendant, Jacques Louis, appeals from the judgment of conviction, rendered after a jury trial, of one count of conspiracy to commit robbery in the first degree with a deadly weapon in violation of General Statutes §§ 53a-48 (a)[1] and 53a-134 (a) (2)[2] and one count of conspiracy to commit robbery in the second degree in violation of § 53a-48 and General Statutes (Rev. to 2011) § 53a-135 (a) (1).[3] On appeal, the defendant claims that the trial court improperly (1) denied his motions for judgment of acquittal and (2) charged the jury with respect to conspiracy in violation of *State v. Pond*, 315 Conn. 451, 108 A.3d 1083 (2015), and that (3) the prosecutor denied him a fair trial by arguing facts not in evidence. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On December 28, 2011, at approximately 8:15 p.m., the defendant, Jean Barjon, Tinesse Tilus, and Guailletemps Jean-Philippe (conspirators) together entered the Caribbean-American Market (market) on Wood Avenue in Bridgeport. They called for the owner, Rene Adolph, who was in the kitchen cooking, to come out. Adolph recognized Tilus and Barjon, but not the defendant and Jean-Philippe, who stood on either side of him. The conspirators demanded money from Adolph, and Jean-Philippe displayed a firearm. Adolph, fearing for his life, ran from the market to the laundry next door and called out for help. The defendant, Barjon, and Tilus chased Adolph, who held the door to the laundry closed as the defendant attempted to open it. Margarita Avcolt, a laundry employee, observed the activity, and telephoned the police. She saw one man trying to open the door and two others standing a "meter" away.

Meanwhile, Jean-Philippe, who had remained in the market, walked into the walled-in area occupied by the cashier, Ramon Tavares. Jean-Philippe displayed his gun and ordered Tavares to give him money. Jean-Philippe took the money Tavares gave him, as well as his phone.

Back at the laundry, Adolph saw a police cruiser passing by so he ran out and flagged down Officer Elizabeth Santoro. The three conspirators, who had followed Adolph to the laundry, ran and got into a car. Adolph pointed to the three conspirators in the car, who were getting ready to "take off." Adolph told Santoro that the men had tried to rob him. He also pointed to Jean-Philippe who by that time was running away from the market on Wood Avenue. Adolph saw him "toss the gun." Santoro was able to detain Jean-Philippe, and told Barjon, the driver of the car not to move. Tilus and the defendant were passengers in the car. According to Santoro, all of the conspirators were

dressed in suits as if they were going somewhere.

Officer Christopher Martin arrived on the scene as backup for Santoro. Martin seized $635 from Jean-Philippe and found a loaded, operable firearm that Jean-Philippe had discarded near a trash receptacle. A firearms expert, Marshall Robinson, examined the gun that Martin recovered and the casings it ejected when fired. As part of his investigation, Robinson learned that the gun had been used to fire cartridges in an incident in New Jersey. Both the defendant and Jean-Philippe were from New Jersey.

The defendant and Barjon were each charged with robbery in the first degree, conspiracy to commit robbery in the first degree, robbery in the second degree, and conspiracy to commit robbery in the second degree and stood trial together. The defendant's theory of defense was that he was "merely present" at the time of the robbery and that Adolph's testimony was not believable. Barjon also claimed that he merely was present at the time of the robbery, that Adolph was not credible, and that Jean-Philippe acted alone in order to collect an unpaid debt from Adolph, who allegedly ran an illegal lottery from the market.[4]

The jury was unable to reach a unanimous verdict with respect to the charges of robbery in the first degree and robbery in the second degree against the defendant,[5] but the jury found him guilty of conspiracy to commit robbery in the first and second degree. At sentencing, the court merged the conspiracy convictions and sentenced the defendant to twelve years in prison, suspended after six years, and five years of probation.

I

The defendant claims that the court violated his right to due process by denying his (1) motion for a judgment of acquittal at the close of the state's case and (2) motion for judgment of acquittal notwithstanding the jury's verdict. He claims that there is no evidence that he was present in the market where the robbery occurred, and therefore, the court should not have permitted the case to go to the jury. He also argues that there is no evidence that he agreed to rob Adolph and that he intended to commit robbery in either the first or second degree, specifically to display or threaten the use of a deadly weapon in the case of conspiracy to commit robbery in the second degree.[6] We do not agree.

The following additional procedural history is relevant to the defendant's claim. After the state rested, the defense counsel, Charles Kurmay, moved for a judgment of acquittal, claiming that there was insufficient evidence that the defendant was present when Jean-Philippe took money from Tavares and no evidence that the defendant agreed to commit a robbery. The court denied the motion stating that Adolph's testimony alone was sufficient for the jury to find the defendant

guilty.[7] The defendant elected not to present any evidence.

The jury found the defendant guilty of conspiracy to commit robbery in the first and in the second degree. Prior to sentencing, the defendant filed a "motion for judgment of acquittal after mistrial" on the charge of robbery in the first degree on the ground of insufficient evidence. He also sought a judgment of acquittal notwithstanding the verdict on the ground that there was insufficient evidence to find him guilty of conspiracy to commit robbery in the first degree. The court denied the motion.[8]

"The due process clause of the fourteenth amendment to the United States constitution protects a criminal defendant from conviction absent proof beyond a reasonable doubt of each fact necessary to constitute the elements of the crime. . . . Because a jury may occasionally convict even when it can be said that no rational trier of fact could find guilty beyond a reasonable doubt, a defendant is entitled to challenge his conviction on that basis with a motion for a judgment of acquittal." (Citation omitted; internal quotation marks omitted.) *State* v. *Watts*, 71 Conn. App. 27, 31, 800 A.2d 619 (2002).

"The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether on the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Martin*, 285 Conn. 135, 147, 939 A.2d 524, cert. denied, 555 U.S. 859, 129 S. Ct. 133, 172 L. Ed. 2d 101, after remand, 110 Conn. App. 171, 954 A.2d 256 (2008), appeal dismissed, 295 Conn. 192, 989 A.2d 1072 (2010).

"[T]he inquiry into whether the record evidence would support a finding of guilt beyond a reasonable doubt does not require a court to ask itself whether it believes that the evidence . . . established guilt beyond a reasonable doubt. . . . Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Watts*, supra, 71 Conn. App. 31. In ruling on a motion for judgment of acquittal, the trial court must determine whether a rational trier of fact could find guilt proven beyond a reasonable doubt. See *State* v. *Delarosa*, 16 Conn. App. 18, 33, 547 A.2d 47 (1988).

The defendant argues that no one ever identified him as having been present at the scene of the robbery in the market. Adolph, however, testified that four men entered the market. He knew Barjon and Tilus, and he identified Jean-Philippe as the man with the gun. He also testified that there was a fourth man, whom he did not know, who stood beside him in the market and that this unknown person chased him to the laundry and tried to pull open the door. When he stopped Santoro, Adolph pointed to Jean-Philippe, who was walking away from the market, and told the officer that he had a gun and had just robbed him. He also told her that the men in the white car in front of the market also had robbed him. Santoro saw three men in the white car. The defendant was a passenger in the car; Barjon was the driver. On appeal, he claims that it is not clear whether he sat in the car during the robbery or got into the car sometime later. He argues that the jury, therefore, had to resort to speculation.

We disagree that no one identified the defendant as a participant in the robbery. According to Adolph, four men entered the market. He recognized two of them, but did not recognize the two men who stood next to him. One of those men had a gun. Barjon and the unknown man without a gun chased him as he ran from the market. At Adolph's direction, Santoro arrested the four men because Adolph stated that they had robbed him. At the time she detained them, three of the men were sitting in a white car in front of the market, and Jean-Philippe was running away. At trial, in response to a question from Barjon's counsel, Matthew Couloute, Santoro testified that the first time she saw Barjon and the defendant, they were in the white car. Santoro also testified that all four of the men were dressed in suits as if they were going to a club. She also testified that the defendant was sitting at counsel table next to Barjon.[9]

The jury also heard testimony from Tavares, the market cashier. According to Tavares, one man with a black gun ordered him to open the glass partition, to stand facing the wall, and to give him the money. Avcolt testified that Adolph ran into the laundry calling for help. Adolph held the door shut while one person whom Avcolt did not recognize tried to open the door to the laundry. The person trying to open the door was not Barjon. She saw two other men standing approximately a meter away from the door while this occurred.

On the basis of the evidence presented, the jury reasonably could have found beyond a reasonable doubt that the defendant was the fourth man to enter the market. Adolph identified two of the men who entered the market by name and there is no dispute that Jean-Philippe was the man with the gun. Given Santoro's testimony that she arrested three men in the car, two of whom were identified by Adolph, by process of elimination, the jury reasonably could have found that the

defendant was the fourth man who robbed the market. Common sense does not take flight at the courthouse door. See, e.g., *State* v. *Zayas*, 195 Conn. 611, 620, 490 A.2d 68 (1985).

The defendant also claims that the court improperly permitted the case to go to the jury because the jury had to resort to speculation and conjecture as to whether he conspired to participate in the robbery. See *State* v. *Rodriquez*, 200 Conn. 685, 687, 513 A.2d 71 (1986) (jury may not speculate or resort to conjecture). He argues that the fact that he was in the car and arrested with Barjon and Tilus is insufficient to prove beyond a reasonable doubt that he conspired to rob the market. He contends that there is no evidence that he agreed with anyone to participate in the robbery let alone that he agreed to every element of the crime of robbery in the first or second degree, i.e., that a deadly weapon would be used or displayed.[10] The defendant relies on our Supreme Court's decision in *State* v. *Pond*, supra, 315 Conn. 451, for the proposition that the state must prove specific intent to agree to commit the subject crime.

"To establish the crime of conspiracy under [§] 53a-48 of the General Statutes, the state must show that there was an agreement between two or more persons to engage in conduct constituting a crime and that the agreement was followed by an overt act in furtherance of the conspiracy by any one of the conspirators. The state must also show intent on the part of the accused that conduct constituting a crime be performed." (Internal quotation marks omitted.) *State* v. *Delarosa*, supra, 16 Conn. App. 33.

Our Supreme Court has explained that § 53a-48 "[c]onspiracy is a specific intent crime, with the intent divided into two elements: [1] the intent to agree or conspire and [2] the intent to commit the offense which is the object of the conspiracy. . . . Thus, [p]*roof of a conspiracy to commit a specific offense requires proof that the conspirators intended to bring about the elements of the conspired offense.*" (Emphasis in the original; internal quotation marks omitted.) *State* v. *Pond*, supra, 315 Conn. 460. "[T]o sustain a conviction for conspiracy to commit a particular offense the [state] must show not only that the conspirators intended to agree but also that they *intended to commit the elements of the offense.*" (Emphasis in the original; internal quotation marks omitted.) Id., 461.

"To establish a violation of § 53a-48 (a), the state must prove that the three essential elements are satisfied: (1) the accused intended that conduct constituting a crime would be performed; (2) the accused formed an agreement with one or more persons to engage in such conduct; and (3) any one of the coconspirators performed some overt act in furtherance of the conspiracy. . . . Conspiracy, then is a specific intent crime, with the intent divided into two elements: [1] the intent to

agree or conspire and [2] the intent to commit the offense which is the object of the conspiracy." (Citation omitted; internal quotation marks omitted.) Id., 467–68.

"The state must also show intent on the part of the accused that conduct constituting a crime be performed. . . . The existence of a formal agreement between the parties need not be proved; it is sufficient to show that they are knowingly engaged in a mutual plan to do a forbidden act. . . . Because of the secret nature of conspiracies, a conviction usually is based on circumstantial evidence. . . . Consequently, it is not necessary to establish that the defendant and his coconspirators signed papers, shook hands, or uttered the words we have an agreement. . . . [T]he requisite agreement or confederation may be inferred from proof of the separate acts of the individuals accused as coconspirators and from the circumstances surrounding the commission of these acts." (Citations omitted; internal quotation marks omitted.) *State* v. *Taft*, 306 Conn. 749, 756–57, 51 A.3d 988 (2012). Our law does not distinguish between direct and circumstantial evidence with regard to probative force. See *State* v. *Crump*, 201 Conn. 489, 495, 518 A.2d 378 (1986).

In the present case, the offenses that are the object of the conspiracy are robbery in the first degree in violation of § 53a-134 (a) (2) and robbery in the second degree in violation of § 53a-135 (a) (1). The burden on the state, therefore, was to prove beyond a reasonable doubt that one of the conspirators was armed with a deadly weapon during the course of the robbery or immediate flight therefrom; see General Statutes § 53a-134 (a) (2); and that he was aided by another person actually present. See General Statutes (Rev. to 2011) § 53a-135 (a) (1).

On the basis of the testimony given by Adolph and Santoro, the jury reasonably could have concluded that the defendant entered the market with three men who intended to commit a robbery therein. Adolph knew Barjon and Tilus, who were customers. He did not know or recognize the defendant or Jean-Philippe. After entering the market, the conspirators surrounded Adolph with the defendant and Jean-Philippe standing on either side of him. Jean-Philippe displayed a black gun and demanded that Adolph give him money. The defendant did not flee when Jean-Philippe displayed the gun. When Adolph fled from the market to the laundry, the defendant followed him and attempted to open the laundry door, which Adolph was holding shut. The gun that was used in the robbery was traced to a crime that had occurred in New Jersey, where Jean-Philippe and the defendant were from. There is no dispute that Jean-Philippe took money and a phone by force from Tavares.

"[I]t is a permissible, albeit not a necessary or mandatory, inference that a defendant intended the natural

consequences of his voluntary conduct." *State* v. *Montanez*, 219 Conn. 16, 20, 592 A.2d 149 (1991). In the present case, the defendant aided the coconspirators by entering the market and standing beside Adolph when Jean-Philippe displayed a gun and ordered Adolph to give him money. "The fact that the defendant stood by silently when a gun was displayed in order to [force the victim to give up his property] . . . is evidence from which the jury might reasonably have inferred the defendant's acquiescence in [an] enlarged criminal enterprise." *State* v. *Crosswell*, 223 Conn. 243, 256, 612 A.2d 1174 (1992). We therefore conclude that there was sufficient evidence by which the jury reasonably could have found that the defendant agreed with three others to enter the market and to threaten the use of physical force to compel Adolph to give them money and that Jean-Philippe would be armed with a deadly weapon. The trial court, therefore, properly denied the defendant's motions for judgment of acquittal.

II

The defendant's second claim is that the court failed to give the jury a conspiracy instruction that complied with *State* v. *Pond*, supra, 315 Conn. 451. The state claims that the defendant's claim is not reviewable because the defendant failed to (1) preserve it at trial,[11] (2) comply with Practice Book § 67-4 (d) (2), or (3) adequately brief the claim. We agree that the defendant failed to preserve the claim at trial, but we will review it pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), because the court's charge is contained in the record and a claim of instructional error as to an essential element of a crime may violate the defendant's due process rights to a fair trial. See *State* v. *Leroy*, 232 Conn. 1, 7, 653 A.2d 161 (1995). We disagree, however, that the alleged constitutional violation exists.

"When reviewing [a] challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) *State* v. *Ortiz*, 71 Conn. App. 865, 872, 804 A.2d 937, cert. denied, 261 Conn. 942, 808 A.2d 1136 (2002).

On the basis of our review of the court's charge to the jury, we disagree that the court's charge is not in accordance with the legal principles articulated in

*Pond*. The more fundamental problem with the defendant's claim is that it is predicated upon the crime at issue in *Pond*, conspiracy to commit robbery in the second degree in violation of General Statutes (Rev. to 2007) § 53a-135 (a) (2) ("displays or threatens the use of . . . a deadly weapon or a dangerous instrument"). The defendant in the present case was charged with conspiracy to commit robbery in the second degree in violation of a different statutory provision, namely, General Statutes (Rev. to 2011) § 53a-135 (a) (1) ("he is aided by another person actually present").

On appeal, the defendant takes issue with the following portion of the court's charge: "The state must further prove that the conspirators understood that a deadly weapon would be carried by one of the participants. The state need not prove a formal or express agreement. The state may rely upon circumstantial evidence, if sufficient, to prove this element beyond a reasonable doubt."

The law regarding conspiracy is well known. "To establish the crime of conspiracy under § 53a-48 . . . the state must show that there was an agreement between two or more persons to engage in conduct constituting a crime and that the agreement was followed by an overt act in furtherance of the conspiracy by any one of the conspirators. The state must also show intent on the part of the accused that conduct constituting a crime be performed. The existence of a formal agreement between the parties need not be proved; it is sufficient to show that they are knowingly engaged in a mutual plan to do a forbidden act." (Internal quotation marks omitted.) *State* v. *Millan*, 290 Conn. 816, 825–26, 966 A.2d 699 (2009). "[T]he requisite agreement or confederation may be inferred from proof of the separate acts of the individuals accused as coconspirators and from the circumstances surrounding the commission of those acts." (Internal quotation marks omitted.) Id., 826. Furthermore, "[a] coconspirator's conduct at the scene can provide the requisite evidence of an agreement." Id., 828.

The defendant also claims that the court failed to instruct the jury that he had the specific intent that the robbery would involve the display or threatened use of what the defendant represented to be a deadly weapon or dangerous instrument. In support of his claim the defendant relies on the following language from *State* v. *Pond*, supra, 315 Conn. 451. "[T]he trial court should have instructed the jury that, to find the defendant guilty of conspiracy to commit robbery in the second degree in violation of §§ 53a-135 (a) (2) and 53a-48 (a), it had to find that the defendant specifically intended that the robbery would have involved the display or threatened use of what [the other conspirator] represented to be a deadly weapon or dangerous instrument." Id., 466. Although the Supreme Court held that the trial court

must instruct the jury that a defendant had the intent to conspire to commit the crime that is the object of the conspiracy, the language quoted by the defendant is inapplicable to the present case because the defendant here was not charged with violation of § 53a-135 (a) (2). He was charged with conspiracy to commit burglary in the second degree in violation of § 53a-135 (a) (1).

Our review of the transcript reveals that the court charged the jury with respect to robbery in the first degree and robbery in the second degree. After each of those instructions, the court gave the respective charge as to conspiracy to commit the charged robbery offenses, which we summarize in relevant part. "To convict a defendant of conspiracy to commit robbery in the first degree, the state must prove three essential elements. First, an agreement between the defendant and one or more persons to engage in the crime of robbery in the first degree. Second, an overt act in furtherance of the subject of the agreement to commit robbery in the first degree committed by one of those persons who was a member of the conspiracy; and third, proof that the defendant acted with the intent to commit robbery in the first degree, and the crime of robbery in the first degree requires an intent to permanently steal property from a person.

"As to the first element, an agreement, the state must prove that the defendant whose conduct you're examining, came to an understanding with at least one other person to take property from Rene Adolph under circumstances that amounted to robbery in the first degree, that is, taking property by threat or force. The state must prove further that there was an understanding that force would be used to force someone to give up property. *The state must further prove that the conspirators understood that a deadly weapon would be carried by one of the participants.* The state need not prove a formal or express agreement. The state may rely upon circumstantial evidence, if sufficient, to prove this element beyond a reasonable doubt." (Emphasis added.)

"To convict a defendant of conspiracy to commit robbery in the second degree, the state must prove three essential elements. First, the state must prove an agreement between the defendant whose conduct you are considering and one or more persons to engage in conduct that amounted to robbery in the second degree. Second, an overt act in furtherance of the agreement must be proven. An overt act by one or more of the participants, one or more members of the conspiracy; and third, proof that the defendant whose conduct you are considering acted with intent to permanently deprive Mr. Adolph of his property. So you must focus upon each defendant individually and decide whether the essential elements have been proven as to that defendant.

"As to the first element, an agreement, the state must prove that the defendant came to an understanding with at least one other person to take property from Rene Adolph under circumstances that amounted to robbery in the second degree. *The state must prove there was an understanding that the person who took the property would be aided by another person actually present.*" (Emphasis added.)

After reviewing the charges against the defendant and the court's instruction to the jury, we conclude that the court properly instructed the jury with respect to the conspiracy charges lodged against the defendant in conformity with *State* v. *Pond*, supra, 315 Conn. 454. The court instructed the jury with respect to robbery in the first degree that the state had to prove that the "coconspirators understood a deadly weapon would be carried by one of the participants," and with respect to robbery in the second degree that there was "an understanding that the person who took the property would be aided by another person actually present." The instructions given by the court properly guided the jury to consider the issues before it. The defendant's claim of instructional error, therefore, fails.

III

The defendant also claims that he was denied the right to due process by the prosecutor, who allegedly argued facts not in evidence during his rebuttal argument. We disagree that the prosecutor's rebuttal argument was improper.

The defendant's analysis of this claim verges on insufficient, as he refers only to the following portion of the transcript of the prosecutor's rebuttal argument:

"[The Prosecutor]: This isn't TV, this didn't come with a script, there's no commercials. Why didn't the officers do DNA? Why didn't the officers do fingerprints? Why didn't the officers—why didn't they? Ask yourselves, why should they. They had the eyewitness, they had another eyewitness, and they had a third eyewitness on scene. These four individuals, two seated in this courtroom today, came in and robbed him.

"[Attorney Kurmay]: Objection. That mischaracterizes the testimony. They never said this man came in and robbed anyone.

"The Court: The jury will find what the facts are. This is just argument at this time."

The standard for review of claims of prosecutorial impropriety is well known. "[T]he touchstone of due process analysis in cases of alleged prosecutorial [impropriety] is the fairness of the trial, and not the culpability of the prosecutor. . . . The issue is whether the prosecutor's conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process. . . . [T]he burden is on the defendant

to show, not only that the remarks were improper, but also that, considered in light of the whole trial, the improprieties were so egregious that they amounted to a denial of due process. . . .

"[I]n analyzing claims of prosecutorial [impropriety], we engage in a two step analytical process. The two steps are separate and distinct: (1) whether [impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of his due process right to a fair trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Campbell*, 149 Conn. App. 405, 434–35, 88 A.3d 1258, cert. denied, 312 Conn. 907, 93 A.3d 157 (2014).

In its brief, the state directed us to the substance of the prosecutor's initial closing argument, as well as that of defense counsel. Initially, the prosecutor marshaled the evidence by which the jury reasonably could infer that the defendant, Barjon, Tilus, and Jean-Philippe conspired to and robbed Adolph. Thereafter Barjon's counsel, Couloute, argued stating in part: "Did a robbery occur? Yes. Can counsel prove [Jean-Philippe] robbed the store? Absolutely. Is there any evidence that this man [Barjon] was involved in that? Outside of conflicting testimony, there isn't. Do you find the person guilty based on conflicting testimony, that someone who you know lied, to actually even have these people arrested? That's what they're asking you to do, and that's what I mean when I say everybody has to do their job."

Kurmay then argued on behalf of the defendant, claiming that the defendant was on trial because an hysterical man who had just been robbed rushed to identify the perpetrator and his "allegation" was "compounded by poor police work." Kurmay continued: "When we talk about the identification, let's talk about this. It deserves some serious attention. No eyewitness, not one, got up there and said [the defendant] came in the store and robbed anybody, not Mr. Adolph, the man whose store it was. [Adolph] came in here and said I don't recognize him. I recognize one of them, [Barjon], but he doesn't recognize [the defendant], has no idea who he is.

"Then you have Mr. Travares. Mr. Tavares comes in and says . . . I don't know. I don't know who he is. I was robbed by a man with long hair, but then you hear Officer Santoro come in, and she gives a description of Mr. [Jean-Philippe], the guilty party, the man that actually did rob someone, as having long hair . . . ." He further argued that Avcolt testified that there was only one man at the door of the laundry. Kurmay also criticized the quality of the police investigation. "There are no fingerprints on that gun they were able to lift or that they even tried to lift. . . . This is like making a medical decision without any diagnostic testing, like having no MRI, no CT scan, no nothing. In this case, there's no fingerprint, there's no DNA, there's no hair

evidence. Lord knows he's got plenty of hair. If there was this big struggle, why didn't they find any? But they never tried."

The defendant's claim on appeal as to the prosecutor's rebuttal argument was that the prosecutor mischaracterized the evidence that the defendant participated in the robbery at the market. On the basis of our review of the record, we conclude that the portion of the argument to which the defendant objects was not improper. Adolph and Santoro testified that there were four men involved in the robbery. Adolph and Avcolt testified that they did not recognize or know one of the men who did not have the gun. Adolph told Santos three of the men who had tried to rob him had gotten into a car and were ready to take off. Santoro identified the man sitting next to Barjon as one of the men in the white car whom she arrested. As the trial court pointed out, the facts were to be determined by the jury.[12] In its general instructions, the court charged the jury that it was its recollection of the facts that controlled, not the facts that counsel may have argued. The jury is presumed to have followed the instructions of the court absent a clear indication to the contrary. See *State* v. *Raguseo*, 225 Conn. 114, 131, 622 A.2d 529 (1993). The defendant's claim of prosecutorial impropriety therefore fails.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

[2] General Statutes § 53a-134 (a) provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (2) is armed with a deadly weapon . . . ."

General Statutes § 53a-133 provides: "A person commits robbery when, in the course of committing a larceny, he uses or threatens the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny."

[3] General Statutes (Rev. to 2011) § 53a-135 (a) provides in relevant part: "A person is guilty of robbery in the second degree when he commits robbery as defined in section 53a-133 and (1) he is aided by another person actually present . . . ." See footnote 2 of this opinion.

Hereinafter, all references to § 53a-135 are to the 2011 revision of the statute unless otherwise indicated.

[4] The jury found Barjon guilty of all four charges against him. In a separate trial, a jury found Tilus guilty of robbery in the first degree. See *State* v. *Tilus*, 157 Conn. App. 453, 117 A.3d 920, cert. granted, 317 Conn. 915, 117 A.3d 854 (2015). Prior to the defendant's trial, Jean-Philippe pleaded guilty to both robbery in the first degree and conspiracy to commit robbery in the first degree.

[5] At the time the defendant was sentenced, the state entered a nolle prosequi with respect to the two robbery charges.

[6] The defendant was charged with conspiracy to commit robbery in the second degree in violation of §§ 53a-48 and 53a-135 (a) (1). To be found guilty of robbery in the second degree in violation of § 53a-135 (a) (1), a

defendant need not display or threaten the use of a deadly weapon. See footnote 3 of this opinion.

The defendant's claim appears to be founded on the elements of subdivision (2) of General Statutes (Rev. to 2011) § 53a-135 (a) which provides: "in the course of the commission of the crime or of immediate flight therefrom he or another participant in the crime displays or threatens the use of what he represents by his words or conduct to be a deadly weapon or a dangerous instrument." The defendant was not charged with the crime of conspiracy to commit robbery in the second degree in violation of § 53a-135 (a) (2).

[7] The court denied the motion for a judgment of acquittal stating: "Just relying upon [Adolph's] testimony alone, there's sufficient evidence that points out that four people came in the store, three surrounded him, one pulled out a gun and went to the cashier and stole the money, and all four were stopped shortly, within minutes thereafter, out in front by the police and one of the four had just thrown a gun next to the garbage can. There's sufficient evidence for the jury to consider, therefore, the defense motions are denied."

[8] The court ruled on the motion for judgment of acquittal notwithstanding the verdict stating: "[The defendant] was one of four persons who entered a market to collect a debt by force. One of the four persons, not [the defendant], but another person, possessed a handgun and displayed the handgun as he took money by force from one of the persons in the market. The witnesses testified all four were inside the market and participated in the robbery. When the police officer passed by, three of the robbers were sitting in a car outside. It does not follow that all three of those persons were sitting outside all the time. The evidence was to the contrary. Now, the gunman, who has been sentenced, was from New Jersey. This man [the defendant] happens to be from New Jersey. I would conclude from that, that they were friends and came together."

[9] Santoro also testified as follows on cross-examination by Kurmay, the defendant's counsel:

"[Attorney Kurmay]: You never saw [the defendant] outside the car on Sherwood Avenue; is that correct?

"[The Witness]: That's correct.

"[Attorney Kurmay]: The only place you saw him was in the back of the car; is that true?

"[The Witness]: Yes, sir.

"[Attorney Kurmay]: And where was he seated inside the car?

"[The Witness]: I don't remember.

"[Attorney Kurmay]: You don't remember. Do you remember who was driving the car; do you remember?

"[The Witness]: Barjon.

"[Attorney Kurmay]: So [the defendant] was not the driver, correct?

"[The Witness]: Which one is [the defendant]?

"[Attorney Kurmay]: The one sitting next to . . . Barjon.

"[The Witness]: Right. No, not the driver."

[10] Again we note that neither conspiracy to commit robbery in the first or second degree contains the element of "the use of a deadly weapon." See footnote 3 of this opinion.

[11] The state correctly notes that the defendant did not object to the court's proposed conspiracy charge and did not take an exception to that portion of the charge after it was given.

Practice Book § 67-4 (d) (2) provides in relevant part: "When error is claimed in the charge to the jury, the brief or appendix shall include a verbatim statement of all relevant portions of the charge and all relevant exceptions to the charge. . . ." The state included the relevant portion of the court's charge in the appendix to its brief.

[12] Our review of the final arguments reveals that all counsel objected repeatedly to the characterization of the evidence by all opposing counsel. The court repeatedly stated that the facts were to be determined by the jury.