******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* TIJUAN GIBSON
## (SC 20320)

Robinson, C. J., and McDonald, D'Auria,
Kahn, Ecker and Keller, Js.

*Syllabus*

Convicted of felony murder, robbery in the first degree, conspiracy to commit robbery in the first degree, and criminal possession of a firearm in connection with the shooting death of the victim, the defendant appealed. At the defendant's trial, one of the state's witnesses, S, testified that the defendant knew that the victim had a significant amount of cash on him and that the defendant planned to steal it. S testified that, at the defendant's request, he drove the victim to the home of the defendant's mother, where the defendant, in S's presence, robbed and then shot the victim. The state presented additional evidence that was consistent with S's account of the events. Another witness, A, testified that she lived across the street from where the victim's body was found and that she saw the defendant push a person matching the victim's description against a wall and drag him toward the lawn of an abandoned house, and then A heard gunshots. The trial court also admitted into evidence, over defense counsel's objection, portions of A's written statement to the police. In addition, before calling the defendant's nephew, R, to testify, the prosecutor represented to the court that R had pending criminal charges against him. The court initially indicated that it would prohibit an inquiry by defense counsel into those charges, but, after hearing additional argument, the court revised its ruling by stating that defense counsel could question R about the existence of pending charges and the maximum penalty that could be imposed for those charges, so long as the questions were directed toward the issue of bias. Ultimately, the prosecutor presented R's testimony, which corroborated S's testimony, but the prosecutor did not mention the charges against R during direct examination, and defense counsel declined to cross-examine R. *Held*:

1. The trial court properly admitted the portions of A's written statement to the police because, even if the admission of that evidence was improper, any error was harmless: A's account of the events leading up to the shooting was not central to the state's case because the defendant admitted in his interview with the police that he witnessed the shooting and was in the area where the crime occurred, and, thus, the state did not need A's testimony to place the defendant at the crime scene; moreover, because the jury found the defendant not guilty of murder but guilty of felony murder, A's testimony did not substantially sway the jury's conclusion with respect to the question of whether the defendant was the person who actually killed the victim; furthermore, several independent pieces of evidence implicated the defendant in the robbery, and it was unlikely that any bolstering caused by the admission of the portions of A's written statement would have changed the way the jury viewed A's account of the events.

2. The trial court did not violate the defendant's constitutional right to confront the witnesses against him by precluding defense counsel from cross-examining R about R's pending criminal charges: the court expressly stated that defense counsel could cross-examine R about the fact that he had pending criminal charges and the maximum penalties that he was facing, and defense counsel's decision to forgo that opportunity was his own; moreover, even if the restrictions placed on defense counsel's cross-examination of R infringed on the defendant's confrontation rights, the state demonstrated that any such infringement was harmless beyond a reasonable doubt, as R's testimony was not critical to the state's case because he was neither a participant in, nor a witness to, the attack on the victim, and the central points of R's testimony were consistent with the account of the events that the defendant had provided during his interview with the police.

Argued March 22—officially released August 23, 2021*

Substitute information charging the defendant with the crimes of murder, felony murder, robbery in the first degree, conspiracy to commit robbery in the first degree and criminal possession of a firearm, brought to the Superior Court in the judicial district of Waterbury, where the charges of murder, felony murder, robbery in the first degree and conspiracy to commit robbery in the first degree were tried to the jury before *Crawford, J.*; verdict of guilty of felony murder, robbery in the first degree and conspiracy to commit robbery in the first degree; thereafter, the charge of criminal possession of a firearm was tried to the court, *Crawford, J.*; finding of guilty; judgment of guilty in accordance with the jury's verdict and the court's finding, from which the defendant appealed to this court. *Affirmed.*

*Alice Osedach*, assistant public defender, for the appellant (defendant).

*Kathryn W. Bare*, senior assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, and *Cynthia Serafini* and *Terence D. Mariani*, senior assistant state's attorneys, for the appellee (state).

*Opinion*

KAHN, J. The defendant, Tijuan Gibson, appeals from the judgment of the trial court convicting him of the crimes of felony murder in violation of General Statutes § 53a-54c, robbery in the first degree in violation of General Statutes § 53a-134 (a) (1), conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 and 53a-134 (a) (1), and criminal possession of a firearm in violation of General Statutes § 53a-217.[1] On appeal, the defendant claims that (1) the trial court improperly admitted portions of a written statement from one of the state's witnesses, Shyaira Atkinson, into evidence; and (2) the trial court unduly restricted the cross-examination of another state's witness, Levar Roach, with respect to certain pending criminal charges. For the reasons that follow, we reject these claims and, accordingly, affirm the judgment of the trial court.

The record contains the following undisputed facts and procedural history relevant to the present appeal. This case arises out of the shooting death of the victim, Savion Bostic Aponte, on Ridgewood Street in the city of Waterbury shortly after 10:30 p.m. on January 27, 2017. Around 5 p.m. that day, the victim traveled from the Willow Street area to the home of a coworker in order to purchase a red Volkswagen Jetta. The victim, who had just received a paycheck, gave his coworker a few hundred dollars in cash as a down payment and then drove the car to his nephew's birthday party at a local Chuck E. Cheese's restaurant. The victim's sister, Rebecca Ruiz, testified that the victim left the party at approximately 8 p.m. At 8:30 p.m., the victim returned to the Willow Street area and began to socialize with a group of people outside of a liquor store. Footage from security cameras introduced by the state at trial show that this group included, among other people, both Tysean Snow and the defendant. The group eventually disbursed, and, at 10:13 p.m., a second set of security cameras located outside of a restaurant two blocks to the south along Willow Street recorded the victim's red Jetta pulling up alongside of the curb and Snow getting into the passenger seat.

Shortly after 10:30 p.m., multiple people living along Ridgewood Street between Wyman Street and Chestnut Avenue heard gunfire; however, none of them reported it to the police. Around 8 a.m. the following morning, a person saw the victim's body lying under a tree on the lawn of an abandoned home located on the corner of Ridgewood Street and Chestnut Avenue. The victim's yellow shirt, white hooded sweatshirt, black jacket, and blue shoes were lying on the ground next to his body. His pants were pulled down past his knees. Three bullets were recovered from the victim's body; two from his head and one from his back. The medical examiner responsible for the victim's autopsy testified that one

of the shots to the victim's head had been fired at close range. The medical examiner testified that such a wound would have caused the victim to lose consciousness instantaneously.

During trial, the jury was presented with two different accounts of the events leading up to the victim's death. The first of these accounts came from Snow, who, in exchange for a plea deal, agreed to testify as a witness for the state. The second was derived from the defendant's own statements to the police.

According to Snow, the defendant knew that the victim had a significant amount of cash on him earlier in the day and had told at least one other person that he planned to steal it.[2] Snow testified that the defendant had called and asked him to bring the victim down to the corner of Ridgewood Street and Wyman Street so that they could "drink a bottle" together at a house owned by the defendant's mother. Snow told the jury that he had known at the time that this invitation was likely a trap for the victim but, nonetheless, complied with the defendant's request because he hoped to get a portion of what was stolen.

Snow indicated that he and the victim drove down to the home of the defendant's mother in the red Jetta and parked behind a Honda on Wyman Street. Snow stated that the defendant's nephew, Roach, had been inside of the Honda at the time and that the three of them spoke briefly. Snow testified that both he and the victim then crossed Wyman Street to meet the defendant in the yard outside of his mother's house. Snow indicated that the victim and the defendant soon began arguing and that the three of them eventually moved up the hill onto Ridgewood Street. Snow testified that the defendant then grabbed the victim by the shoulder and pushed him up against a wall. According to Snow, the defendant then started asking the victim where the money was and began going through the victim's pockets. Snow stated that the defendant subsequently dragged the victim up onto a nearby lawn and continued his search for the money by stripping the clothing off of the victim's upper body. Snow indicated that the defendant then took out a silver revolver, pointed it in the direction of the victim's head, and said "you think I'm fucking playing?" Snow stated that the defendant then took off the victim's shoes, searched around the victim's ankles for the money, and then grabbed the victim by the pants. Snow testified that, at this point, the defendant shot the gun twice in quick succession and that the victim dropped to the ground. Snow stated that, as he was fleeing, he heard the gun go off a third time and then turned to see the defendant beginning to run down Ridgewood Street toward the parked Honda where Roach was sitting.

The state introduced several additional items of evidence that were consistent with Snow's version of

events that evening. First, telephone records admitted into evidence at trial show that the defendant called Snow at 10:37 p.m. on the evening in question and that this call lasted approximately twenty-seven seconds. Second, Atkinson testified that she lived across the street from where the victim's body was found and that, around 10:30 p.m. on January 27, 2017, she heard an argument taking place outside on the street. Atkinson looked out the window and saw the defendant pushing a person matching the victim's description up against a wall while pointing a finger in his face.[3] Atkinson heard the defendant tell the person to leave but, moments later, saw the defendant dragging him by the back of his coat up onto the lawn of the abandoned house across the street. Atkinson lost sight of the altercation, stepped away from the window, and then heard gunshots. She then returned to the window and saw the defendant running down Ridgewood Street, toward Wyman Street. Atkinson indicated that a third person was present during the altercation between the defendant and the victim but that she never saw that person say or do anything to the victim. Finally, Roach also testified at trial and not only corroborated Snow's testimony about the conversation on Wyman Street before the shooting, but also indicated that, a short time later, the defendant approached the Honda that he had been sitting in, told him that there had been a shooting in the area involving "the boys," and asked for a ride to New Haven.

Although the defendant elected not to testify at trial, the jury heard his evolving versions of events through his prior statements to the police. The day after the victim's death, the defendant gave a sworn, written statement to the police indicating that he had been at the home of a female acquaintance, Beth Quinones, on Willow Street from 10 p.m. that evening until 5 a.m. the following morning. During a video-recorded interview conducted after his arrest, the defendant admitted to the police that he was on Ridgewood Street that evening and had, in fact, witnessed the shooting of the victim. Specifically, during that interview, the defendant described, in detail, how he had seen Snow pull out a gun and shoot the victim. At that time, the defendant maintained that he had been in the area only because he was visiting a second female acquaintance, Monique Reed, at a house across the street from where the shooting occurred. The defendant identified Snow as the sole perpetrator and, again, denied participating in any crimes against the victim.[4]

A significant amount of circumstantial evidence presented at trial suggested that the defendant was something more than an innocent bystander. First, testimony demonstrated that the defendant repeatedly lied to the police about his whereabouts around the time of the victim's death. At trial, Quinones testified that the defendant did spend the night with her that evening but that he did not arrive at her home until approximately 11 p.m. Reed

testified that she had not seen the defendant at all that evening. The defendant also admitted that he deleted data from one of his cell phones before surrendering it to the police,[5] and the victim's red Jetta was recovered on Tower Road, only a short distance from Quinones' home. Finally, although, in his video-recorded interview with the police, the defendant denied attempting to rob the victim, he also complained about having to get money from his wife, and he admitted that he had known the victim was carrying cash earlier in the day to purchase a car.

The defendant was arrested and charged with murder, felony murder, robbery in the first degree, conspiracy to commit robbery in the first degree, and criminal possession of a firearm. The defendant elected a bench trial as to the charge of criminal possession of a firearm but claimed a trial by jury on the remaining charges. After a two week trial, the jury returned a verdict, finding the defendant not guilty of the crime of murder but guilty of the crimes of felony murder, robbery in the first degree, and conspiracy to commit robbery. Thereafter, the trial court found the defendant guilty of the crime of criminal possession of a firearm. The trial court subsequently rendered a judgment of conviction in accordance with the jury's verdict and its own finding, and imposed a sentence of fifty years of imprisonment for felony murder, a concurrent sentence of five years of imprisonment for robbery in the first degree, a concurrent sentence of five years of imprisonment for conspiracy to commit robbery in the first degree, and a consecutive sentence of five years of imprisonment for criminal possession of a firearm, resulting in a total effective sentence of fifty-five years of imprisonment. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The defendant's first claim is that the trial court committed reversible error by admitting portions of Atkinson's written statement to the police into evidence. The state responds by arguing that the trial court's admission of the statement was proper and that, even if it was not, any error was harmless. For the reasons that follow, we agree with the state and conclude that, even if we were to assume that the trial court's admission of Atkinson's statement was improper, any error was harmless.

The following additional facts and procedural history are relevant to our consideration of this claim. On direct examination, Atkinson testified that the defendant had been the person yelling outside of her window that night and, specifically, that she had recognized the sound of his voice from a series of previous conversations at a local store. Although Atkinson clearly testified both that the defendant was on Ridgewood Street that evening and that she had no doubt in her mind about that identification, she did not expressly testify on direct examination that she recognized the defendant that night by sight.

On cross-examination, defense counsel highlighted the fact that Atkinson's previous written statement to the police did not include the fact that she had recognized the defendant by his voice. Defense counsel then asked the following question: "If you recognizing the voice is not in the statement, is that because you didn't want it in there?" In response, Atkinson indicated that her recognition of the defendant's voice was not in the statement because she had never expressly mentioned that fact to the police. On redirect examination, the prosecutor sought to rehabilitate Atkinson's testimony by admitting her written statement to the police as a prior consistent statement. Defense counsel objected, arguing that none of the grounds for admission set forth in § 6-11 (b) of the Connecticut Code of Evidence applied. The trial court overruled that objection and ultimately admitted almost the entirety of Atkinson's written statement into evidence.[6]

The standard of review applicable to the defendant's claim of evidentiary error is well established. "We review the trial court's decision to admit evidence, if premised on a correct view of the law . . . for an abuse of discretion." (Internal quotation marks omitted.) *State* v. *Beavers*, 290 Conn. 386, 396, 963 A.2d 956 (2009); see also *State* v. *Snelgrove*, 288 Conn. 742, 758, 954 A.2d 165 (2008). "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [W]hether [an improper ruling] is harmless in a particular case depends [on] a number of factors, such as the importance of the . . . testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the . . . evidence on the trier of fact and the result of the trial. . . . [T]he proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error. . . . Accordingly, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) *State* v. *Courtney G.*, 339 Conn. 328, 338, 260 A.3d 1152 (2021); see also *State* v. *Sinclair*, 332 Conn. 204, 233, 210 A.3d 509 (2019).

The defendant argues that the trial court's admission of Atkinson's statement to the police was harmful because it unfairly bolstered her credibility to the jury.[7] The defendant asserts that Atkinson's testimony was critical to the state's case because her account corroborated Snow's testimony. In response, the state argues that the inconsistencies in the defendant's statements to the police, the various pieces of evidence directly contradicting his version of events, and the evidence demonstrating his con-

sciousness of guilt, cumulatively, made its case a strong one.

We begin our analysis of these arguments by noting two distinct ways in which Atkinson's testimony was *not* central to the state's case against the defendant. First, during his video-recorded interview with the police following his arrest, the defendant expressly admitted to being on Ridgewood Street and to witnessing the shooting. As a result, the state did not need Atkinson's testimony to place the defendant at the scene of the crime. At trial, defense counsel argued that Snow was the sole perpetrator of the robbery and that the defendant's presence was merely coincidental. Second, the fact that the jury returned a verdict finding the defendant not guilty of the crime of murder, but guilty of felony murder, illustrates that Atkinson's testimony did not substantially sway the jury's conclusion with respect to the ultimate question of whether the defendant was the person who actually killed the victim.

Although Snow's credibility as a cooperating accomplice heightened the importance of any evidence that tended to corroborate his testimony, Atkinson's account of the events was far from the only piece of evidence demonstrating the defendant's involvement in the robbery. The telephone records admitted at trial show that Snow and the defendant were in contact with one another within minutes of the shooting. Testimony from Quinones and Reed demonstrated that the defendant had lied to the police not once, but twice, about his whereabouts that evening. Before turning his cell phones over to the police, the defendant deleted data from around the time of the victim's death. The defendant admitted to the police that he was short on money and that he knew the victim was in possession of cash earlier in the day to buy a car. The victim's car was eventually recovered on Tower Road, which is near the location where the defendant eventually spent the night with Quinones. Although this evidence is largely circumstantial, it significantly diminished the degree to which the state was required to rely on Atkinson's testimony to demonstrate that the defendant's presence on Ridgewood Street at the moment of the shooting was not simply a coincidence.

Moreover, even if we were to agree with the defendant that Atkinson's testimony was a critical component of the state's case, the defendant has presented this court with no plausible reason to believe that the absence of her previous written statement would have caused the jury to view her in-court testimony with suspicion. At trial, during a discussion conducted outside the presence of the jury as to whether the admission of Atkinson's statement was needed, defense counsel plainly stated that his original attempt to impeach Atkinson had failed and that he assessed Atkinson's in-court testimony to be "highly credible . . . ." Indeed, defense counsel even expressly relied on Atkinson's account of the events during closing

arguments by emphasizing the fact that she had recognized the defendant's voice and that she had heard the defendant tell the victim to leave.

We conclude that the defendant has failed to satisfy his burden of demonstrating that the admission of Atkinson's written statement to the police substantially swayed the jury's verdict. Several independent pieces of evidence implicated the defendant in the robbery, and it is unlikely that any bolstering caused by the trial court's admission of Atkinson's written statement would have changed the way the jury viewed her account of the events. As a result, this claim of evidentiary error fails.[8]

## II

The defendant's second claim is that the trial court violated his federal constitutional right to confront the witnesses against him by categorically preventing him from cross-examining Roach about pending criminal charges.[9] The state responds by arguing that the trial court's ruling did not categorically deny the defendant an opportunity to question Roach and that, even if the defendant's cross-examination of Roach was improperly restricted, any error was harmless beyond a reasonable doubt. We agree with the state.

The following additional procedural history is relevant to our consideration of this claim. Before calling Roach to the stand, the prosecutor represented to the trial court that Roach had pending criminal charges against him for certain unrelated crimes and that the state had not entered into a cooperation agreement with him or offered him anything in exchange for his testimony in the present case. Roach's counsel, who was present at the time, stated that an offer had been made by the court in Roach's pending case[10] and that the matter had not yet proceeded to trial. Defense counsel indicated that he intended to inquire about those charges on cross-examination for the purpose of demonstrating bias pursuant to § 6-5 of the Connecticut Code of Evidence. The trial court initially indicated that it would prohibit such an inquiry, stating that "[t]he fact that [Roach] has a case pending by itself is not bias."

After hearing additional argument from the parties and taking a recess, the trial court revised its previous ruling by stating that defense counsel could question Roach about "anything that is factual that you believe goes to showing interest, prejudice, bias, or motive . . . ." The trial court then noted, in particular, that it viewed both the existence of pending charges against Roach and the maximum penalty that could be imposed for those charges as matters of fact that could be explored by defense counsel on cross-examination, so long as the questions put to the witness were directed toward the issue of bias.[11] The trial court did, however, prohibit defense counsel from speculating about the "final charges" at issue in that case, inquiring about the nature of the criminal conduct underlying those charges, or going into any "plea negotiations . . . ." Ulti-

mately, the prosecutor did not mention the charges pending against Roach in the course of its direct examination, and defense counsel declined to conduct any cross-examination at all.

We begin by setting forth the principles of law relevant to our consideration of the defendant's claim. "The sixth amendment to the [United States] constitution guarantees the right of an accused in a criminal prosecution to confront the witnesses against him.[12] . . . The primary interest secured by confrontation is the right to cross-examination . . . and an important function of cross-examination is the exposure of a witness' motivation in testifying. . . . Cross-examination to elicit facts tending to show motive, interest, bias and prejudice is a matter of right and may not be unduly restricted." (Footnote added; internal quotation marks omitted.) *State* v. *Davis*, 298 Conn. 1, 8–9, 1 A.3d 76 (2010). "The constitutional standard is met when defense counsel is permitted to expose to the jury the facts from which [the] jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." (Internal quotation marks omitted.) *State* v. *Erickson*, 297 Conn. 164, 189, 997 A.2d 480 (2010); see also *State* v. *Wilson*, 188 Conn. 715, 720, 453 A.2d 765 (1982). The common law of this state has, to that end, "consistently recognized the right of an accused, during cross-examination, to place before the jury the fact that criminal charges are pending against the state's witnesses." *State* v. *Ortiz*, 198 Conn. 220, 223, 502 A.2d 400 (1985); see *State* v. *Benedict*, 313 Conn. 494, 510, 98 A.3d 42 (2014) ("[i]t is well settled law that [t]he fact that the witness is a defendant in a criminal prosecution . . . creates an interest which affects his [or her] credibility" (internal quotation marks omitted)); see also *State* v. *George*, 194 Conn. 361, 365, 481 A.2d 1068 (1984), cert. denied, 469 U.S. 1191, 105 S. Ct. 963, 83 L. Ed. 2d 968 (1985).

After a detailed review of the trial transcripts, we reject the defendant's contention that the trial court *categorically* prohibited defense counsel from engaging in any inquiry relating to the charges pending against Roach. Although the trial court's initial discussion of the matter was somewhat unclear, it expressly stated after returning from a recess that defense counsel could cross-examine Roach about the fact that he had criminal charges pending against him and the maximum penalties that he was facing for those charges. Defense counsel's decision to forgo that opportunity was his own.

Even if we were to assume that the partial restrictions placed on defense counsel's cross-examination of Roach[13] infringed on the "irreducible minimum of cross-examination" guaranteed by the confrontation clause of the sixth amendment; *State* v. *Ortiz*, supra, 198 Conn. 224; we would, nonetheless, conclude that the state has met its burden of demonstrating that any such infringement was harmless beyond a reasonable doubt.[14] Because Roach was neither a participant in, nor a witness to, the attack

on the victim, his testimony was in no way critical to the state's case. Indeed, the central points of Roach's testimony—namely, that he saw both Snow and the victim on Wyman Street shortly before the shooting and that, a short time later, the defendant came down from Ridgewood Street and asked him for a ride—were *consistent* with the account of the events that the defendant himself provided to the police during his video-recorded interview. As a result, the defendant's constitutional claim must also fail.[15]

The judgment is affirmed.

In this opinion the other justices concurred.

* August 23, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The defendant appealed directly to this court pursuant to General Statutes § 51-199 (b) (3).

[2] Specifically, Snow testified that he had overheard the defendant telling a person named "Bo" earlier that same evening about his plans to rob the victim. Snow testified that he had tried to warn the victim that someone was going to rob him but that the victim had just "brushed [him] off . . . ."

[3] Atkinson testified that the person being pushed up against the wall was taller than the defendant and "had on a white hoodie and a black big . . . puffy jacket." Although Atkinson was familiar with the victim, she did not know that it was him until the following morning.

[4] Both the defendant's initial statement to the police and the video-recorded interview that followed his arrest were admitted into evidence during the state's case-in-chief.

[5] The deletion of data from the defendant's cell phone was subsequently confirmed by a digital forensic examination.

[6] Although certain limited portions of Atkinson's statement were redacted on the ground that they contained hearsay, those redactions in no way alter our analysis of the evidentiary claim that the defendant now raises on appeal.

[7] Although the defendant nominally contends that this evidentiary error requires a reversal on all counts, his briefing on the question of harm focuses on the impact of Atkinson's testimony on the verdict reached by the jury. As a result, we constrain our own analysis to the same point.

[8] The defendant's briefing of this claim of evidentiary error contains, entwined within it, a cursory assertion that the trial court's admission of Atkinson's prior written statement to the police also impermissibly infringed on his constitutional right to confrontation. The defendant's constitutional right to confront Atkinson was, of course, preserved in the present case because Atkinson testified at trial and was fully available for vigorous cross-examination. See *Crawford* v. *Washington*, 541 U.S. 36, 60 n.9, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004) ("when the declarant appears for cross-examination at trial, the [c]onfrontation [c]lause places no constraints at all on the use of his prior testimonial statements"). A detailed examination of the trial transcripts provides no support for the defendant's claim that the trial court's subsequent evidentiary ruling with respect to Atkinson's statement had the effect of chilling or penalizing the exercise of his constitutional right to confrontation.

[9] The defendant's brief claims, but does not separately analyze, violations of both article first, § 8, of the Connecticut constitution and federal due process rights. As a result, we deem those claims to have been inadequately briefed. See, e.g., *State* v. *Michael T.*, 338 Conn. 705, 739, 259 A.3d 617 (2021).

[10] Defense counsel represented that he had been made aware of the fact that Roach had been "charged with offenses that carry up to a twenty year maximum and [that he has] been made an offer that would require eight years of incarceration."

[11] Specifically, the trial court stated: "[O]bviously, you can impeach to show interest, prejudice, bias, or motive, and I believe that was what I said earlier. You can fashion your questions, as long as it goes to that . . . . So, to the extent all I did get before was that there are pending cases and that obviously would be a fact, and that whatever the maximum penalty is, that would be a fact . . . ." The trial court then emphasized the point further, stating: "I don't want you to think in any way I'm limiting you from addressing those areas . . . . [You are] obviously allowed to question concerning interest, prejudice, bias, or motive for falsely testifying."

[12] The sixth amendment right to confrontation is made applicable to state prosecutions through the due process clause of the fourteenth amendment. See, e.g., *Pointer* v. *Texas*, 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965).

[13] The trial court's restriction with respect to the issue of "plea negotiations" did ostensibly limit defense counsel's ability to inquire about the pretrial offer that Roach had previously received. The record reflects, however, that the pretrial offer was unconnected to Roach's testimony in the present case. Specifically, when defense counsel indicated to the court that he intended to argue that the eight year offer went to bias because "I don't control that offer . . . the state's attorney's office does," Roach's counsel immediately interjected to inform the court that, "for the record, there has been an offer made by the judge." This understanding of the offer is confirmed by the fact that the prosecutor in the present case stated, on the record, that the state had made no agreements with Roach in exchange for his testimony against the defendant. There is no indication on the record that the pretrial offer was connected to Roach's testimony in this case. Because the eight year offer made to Roach was made by the judge presiding over his case, without any connection to this case, and not the state, that offer is not relevant to the question of bias.

[14] Although not dispositive of our harmless error analysis in the present case, we note that, as a purely practical matter, the fact that Roach would have had at least some incentive to testify on behalf of the state would have been apparent from the fact that, while testifying, he was wearing an orange uniform and was visibly in custody.

[15] The defendant raises two claims of error that, in our estimation, do not warrant extended discussion. First, the defendant claims that the trial court improperly declined to provide an instruction on the legal maxim known as "falsus in uno, falsus in omnibus," expressly directed at Snow's testimony. The defendant concedes that the following constituted the "essence" of his proposed instruction: "[I]f you conclude that a witness has deliberately testified falsely in some respect, you should carefully consider whether you should rely on any of that person's testimony." (Internal quotation marks omitted.) A review of the record indicates that such a charge was, in fact, provided to the jury. Language directing that particular instruction to Snow was not warranted. See *State* v. *Aviles*, 277 Conn. 281, 309, 891 A.2d 935 ("[i]f a requested charge is in substance given, the court's failure to give a charge in exact conformance with the words of the request will not constitute a ground for reversal" (internal quotation marks omitted)), cert. denied, 549 U.S. 840, 127 S. Ct. 108, 166 L. Ed. 2d 69 (2006). In reaching this conclusion, we note that the trial court gave a specific accomplice credibility instruction, which expressly cautioned the jury to review that type of testimony with particular care and to scrutinize it closely before accepting it.

Second, the defendant claims that there was insufficient evidence to support his conviction on the charge of criminal possession of a firearm. Because this court is bound to construe the evidence presented by the state in the light most favorable to sustaining the trial court's finding of guilt on that charge; see *State* v. *Millan*, 290 Conn. 816, 825, 966 A.2d 699 (2009); Snow's testimony that the defendant shot the victim, in and of itself, will suffice to sustain it. The trial court, as the finder of fact, expressly credited Snow's testimony. This court will not disturb that decision. Cf. *State* v. *Cavallo*, 200 Conn. 664, 673, 513 A.2d 646 (1986) ("The defendant's argument reflects a misunderstanding of the scope of our review of the sufficiency of the evidence underlying a conviction. On appeal, we do not attempt to weigh the credibility of evidence offered at trial, nor do we purport to substitute our judgment for that of the jury.")